IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1273 T
(Judge Susan G. Braden)

JOAN HUSKINS, as personal representative of the
ESTATE OF PHILIP GOLDSTEIN,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

The defendant, the United States, asks the Court to find the following facts, which are supported by citations to the complaint, to the Declaration of Kenneth Kelly and its exhibits, and to the Declaration of Robert Stoddart (Stoddart Decl.) and its exhibits. Both declarations are filed today as Appendix B (App. B) of the Defendant's Motion for Summary Judgment and Brief in Support Thereof.

1. Philip Goldstein died on September 22, 1998. (Compl. ¶ 4.)

2. Philip Goldstein's legal residence at the time of his death was Broward County, Florida. (Stoddart Decl. Ex. 17, App. B at 59.)

3. On August 21, 1998, Philip Goldstein had executed an amended trust agreement to create a revocable inter vivos trust, the Philip Goldstein Revocable Trust. He served as both grantor and trustee. (Stoddart Decl. Ex. 13 at 1, App. B at 49.)

4. Philip Goldstein was the sole beneficiary of the trust during his lifetime. (Stoddart Decl. Ex. 13 at 2, 4-5, App. B at 50, 52-53.)

5. When Philip Goldstein died, Linda Turcotte became the successor trustee of the Philip Goldstein Revocable Trust under its provisions. (Stoddart Decl. Ex. 13 at 2-4, App. B at 50-52; Ex. 11, App. B at 45.)

6. At the time of Philip Goldstein's death, the Philip Goldstein Revocable Trust held all the assets listed on Schedule G of the federal estate-tax form eventually filed by the Estate of Philip Goldstein, and the Philip Goldstein Revocable Trust was the sole beneficiary of Philip Goldstein's will. (Stoddart Decl. Ex. 17, App. B at 64.)

7. On February 2, 2000, Linda Turcotte, as trustee, entered a contract to sell real estate in Broward County, Florida, to Myrna Stone. (Stoddart Decl. Ex. 3, App. B at 15.) The closing was to occur on or about August 1, 2000. (*Ibid.*, § VI, App. B at 15.)

8. On February 19, 2000, Linda Turcotte, as personal representative of the estate of Philip Goldstein, entered a contract to sell a condominium unit located in the Westhampton Landings condominium in Suffolk County, New York (hereinafter the Westhampton condominium). The purchasers were to be George and Joy Busler. (Stoddart Decl. Ex. 4, App. B at 16.)

9. The contract provided that the sale was to close on March 1, 2000, but that time was not of the essence. (Stoddart Decl. Ex. 4, § 4.1, App. B at 17.)

10. A rider to the contract provided: "The Purchasers shall notify the Seller in advance of the closing of any defects in title. Seller shall have a reasonable time to correct same . . . ." (Stoddart Decl. Ex. 4, App. B at 20.)

11. The contract required the Buslers to complete the purchase despite (1) any defect in title "that a title insurance company would ordinarily insure against without additional

premium" (Stoddart Decl. Ex. 4, § 2.6.8, App. B at 16); and (2) any "lien for which the Buyer is allowed a credit under Paragraph 3.4" (Stoddart Decl. Ex. 4, § 2.6.9, App. B at 16). Paragraph 3.4 allows a credit for a lien only if the lien is "immediately satisfiable by the payment of a sum of money." (Stoddart Decl. Ex. 4, App. B at 17.)

12. William F. Bates represented the estate of Philip Goldstein in connection with the sale of the Westhampton condominium. (Stoddart Decl. Ex. 2 at 2, App. B at 11.)

13. The estate of Philip Goldstein retained Mark S. Hamburgh, Esquire, to prepare the estate-tax returns. (Stoddart Decl. Ex. 2 at 1, App. B at 10.)

14. On March 10, 2000, William F. Bates's legal assistant sent Mark S. Hamburgh an exception sheet from the title company involved in the "Sale to Busler." (Stoddart Decl. Ex. 5, App. B at 24.) The exception stated, in part: "Company . . . requires . . . proof of payment of both New York and Federal Estate Taxes on the Estate of Philip Goldstein." (*Id*., App. B at 25.) The legal assistant asked Mr. Hamburgh to "forward proper documentation to clear the objection as soon as possible." (*Id*., App. B at 24.)

15. On April 10, 2000, Mark S. Hamburgh executed an affidavit to induce the Aquebogue Abstract Corp. (the title company) "to omit Exception No. 19, relating to the lien of federal and state estate taxes from its title report . . . ." (Stoddart Decl. Ex. 6 at 3, App. B at 28.)

16. In his affidavit, Mr. Hamburgh listed the estate's assets and their approximate valuations and stated:

> Based upon the foregoing estimates, I estimate that the gross estate for federal estate tax purposes is $1,194,000. I calculate the federal estate tax on an estate of $194,000 to be $178,474. [footnote omitted] Were this the tax on the Estate, there would be a late filing penalty of $44,619. [footnote omitted] There would also be a late payment penalty of .5% per month that the payment is

> overdue, which at this point in time is 10 months, for a total penalty of 5%, or $8,924. Thus, on an estate of $1,194,000, I calculate the amount due as of today to be $232,017 plus interest.

In one of the omitted footnotes, Mr. Hamburgh notes that the actual tax would be computed on the taxable estate, which is the gross estate minus allowable deductions; when he estimated the estate tax, he disregarded possible deductions. (Stoddart Decl. Ex. 6 at 2, App. B at 27.)

17. Mark S. Hamburgh never requested an extension of time in which to file the estate-tax return for the Goldstein estate. (*See* Stoddart Decl. Ex. 1, App. B at 4.)

18. In his affidavit of April 10, 2000, Mr. Hamburgh stated that he represented the estate in a mortgage foreclosure action (Stoddart Decl. Ex. 6 at 1, App. B at 26), and he listed the mortgage as an estate asset, assigning it a value of $580,000. He noted that this amount was the estimated value of the underlying property and that the mortgage was non-recourse. (*Id*. at 2, App. B at 27.)

19. In April of 2000, Mr. Hamburgh produced handwritten computations of possible estate-tax liability for the estate of Philip Goldstein. (Stoddart Decl. Ex. 2 at 1, App. B at 10.) The computations appear as Exhibit 7 of the Stoddart Declaration, App. B at 29-33. (Stoddart Decl. ¶ 3, App. B at 2.) The estate refers to them as "computations of the worst-case scenario estate tax liability." (*Id*. Ex. 2 at 3, App. B at 12.)

20. In a computation dated April 10, 2000, Mr. Hamburgh calculated the estate tax on 1,194,000 by adding 345,800 to 41% of 194,000 (the gross estate, 1,194,000, minus 1,000,000). This computation resulted in a total of 425,340, from which Mr. Hamburgh subtracted 202,050 (which he captioned "UC" [unified credit]), to reach a result of 223,290. From this sum he subtracted 44,816 (which he captioned "SDTC" [state death-tax credit]) and reached a result of

178,474. To this amount he added a late-filing penalty of 22.5% (44,619), and a late-payment penalty of .5% / month for 10 months, or 5% of the total (8,924), to reach an estate tax of 232,017. (Mr. Hamburgh originally wrote "25%" after the entry "Late filing," but he crossed it out and wrote "22.5%" instead.) To his result of 232,017 he added 13,774, which he captioned "Interest–per Kim Diforbio [spelling unclear] of IRS as of 4/30/00." The final result was 245,791. (Stoddart Decl. Ex. 7, App. B at 29.)

21. On the same page (App. B at 29), Mr. Hamburgh captioned a group of equations "SDTC on 1,134,000." In those equations he adds 38,800 to 6.4% of 94,000 (which the difference between 1,134,000 and 1,040,000). The result is 44,816, the "SDTC."

22. In a computation dated April 14, 2000, in which he followed the same mathematical procedures he had followed on April 10, Mr. Hamburgh calculated an estate tax, plus interest, of $184,905. The calculation begins with the caption "Assets–if mtge [mortgage] is $460,000." The assets, so adjusted, equal $1,074,000. (Stoddart Decl. Ex. 7, App. B at 31.)

23. Mr. Hamburgh also considered the estate tax on what he captioned "Hypo[thetical] estate of $1,000,000." Following the mathematical procedures by which he had produced the preceding two computations, he calculated a federal estate tax of $110,550 for this hypothetical estate. He also calculated a late-filing penalty of $27,638 and a late-payment penalty of $7,186. (Stoddart Decl. Ex. 7, App. B at 33.)

24. On April 10, 2000, Mark S. Hamburgh, the estate of Philip Goldstein (through Linda Turcotte), and the Aquebogue Abstract Corp. entered an escrow agreement, with Mr. Hamburgh as escrowee, under which Aquebogue agreed to omit the exception for the lien of federal and New York estate taxes in exchange for the establishment of an account that would

hold the net proceeds from the sale of the Westhampton condominium. (Stoddart Decl. Ex. 8 at 1-3, App. B at 34-36.) The parties desired "to cause the Exception to be omitted so that Busler is not justified in refusing to close on the sale." (*Id*. at 2, App. B at 35.)

25. Paragraph 6 of the escrow agreement provides (Stoddart Decl. Ex. 8 at 3, App. B at 36):

> Escrowee may, at any time and from time to time, apply all or part of the Escrow to the payment of the federal estate tax and/or penalties and interest thereon . . . and/or New York State estate tax and/or penalties and interest thereon . . . . This includes payment of any amount that may ultimately be determined to have been an overpayment.

26. Paragraph 7 of the escrow agreement provides that the escrowee could release the remainder of the escrow to the estate only "[u]pon the occurrence of both of the following": (a) a discharge of the property from the lien of the Federal Estate Tax, a closing letter issued by the IRS, or "other proof of full payment of the Federal Estate Tax, reasonably satisfactory to Aquebogue" ; and (b) similar proof that the New York Estate Tax had been paid. The paragraph concluded, "However, until the occurrence of both (a) and (b) Escrowee shall not release any part of the Escrow to the Estate or for any other purpose to the benefit of the Estate." (*Id*. at 3-4, App. B at 36-37.)

27. On April 11, 2000, Linda Turcotte executed an affidavit "to induce Aquebogue Abstract Corp. to insure title to the property [the Westhampton condominium] in the purchasers against the lien of the . . . estate taxes." (Stoddart Decl. Ex. 9, App. B at 42-43.) In that affidavit, Linda Turcotte swore under oath "That she acknowledges that the estate is obligated to pay federal and New York estate taxes as a result of the death of Philip Goldstein, and that the net proceeds of the sale of said real estate may be insufficient to pay the total amount of such

taxes that are due and payable." If the proceeds of the sale were insufficient to pay the taxes, she pledged to pay the deficiency either from the Philip Goldstein Revocable Trust or from her personal funds. (*Ibid.*)

28. On May 5, 2000, Linda Turcotte sent Mark S. Hamburgh a letter on the stationery of her Florida attorney Richard Goldstone. She sent the letter by fax and by regular mail. In that letter she stated (Stoddart Decl. Ex. 10, App B at 44):

> Please consider this as my authorization and letter of instructions to pay pending estate taxes for the Estate of Philip Goldstein.
>
> I am aware that you are presently holding approximately $167,000.00 as proceeds of sale from the closing of the estate's real property in Westhampton Beach, New York. The sum of $165,000.00 should be applied to pay Federal Estate Taxes and/or New York Estate Taxes as soon as possible. Please discuss and determine the payment/s to Internal Revenue Service and the State of New York and the amount or amounts thereof, between yourself and my Florida attorney, Richard Goldstone. Your mutual decision who to pay and how much to pay will be acceptable to me.

29. Also on May 5, 2000, Mark S. Hamburgh sent the IRS a check for $165,000 from the escrow funds held in his IOLTA account. The check bore the notation "Estate Tax / Philip Goldstein" and the estate's tax identification number. The IRS stamped the check as received on May 5, 2000. (Compl. Ex. A, second page.) Mr. Hamburgh sent the check with a cover letter, also dated May 5, 2000. The letter stated (Compl. Ex. A, first page):

> In accordance with our telephone conversation on April 13, 2000, I attach my Attorney IOLTA Account check no. 1229, payable to the United States Treasury, in the amount of $165,000. This payment is to be applied to the estate tax on the estate of the above-named decedent.
>
> The Form 706 [estate-tax return] has not yet been filed.

30. The IRS posted the remittance to the account of the Goldstein estate as a "subsequent payment," using the code number 670. (Stoddart Decl. Ex. 1A, App B at 9.) This code is one of the master codes that IRS personnel use to enter data into the IRS's computerized records. (Kelly Decl. ¶ 1, App. B at 66.)

31. The code number 670 denotes only payments; it never indicates a deposit in the nature of a cash bond. (*Id.* ¶ 4, App. B at 67.)

32. If the IRS had entered the estate's remittance as a deposit in the nature of a cash bond, it would have used the code number 640 with the blocking series 990-999. Interest does not normally accrue on amounts posted with a code 640. (*Id.* ¶ 3, App. B at 66-67; *see also id.* Ex. A, App. B at 69.)

33. If a taxpayer asks in writing to have a remittance treated as a deposit in the nature of a cash bond, the remittance will be posted with a 640 code. Otherwise, unless an examination is in progress, the agent will post the remittance as an advance payment on deficiency. (Kelly Decl. ¶ 5, App. B at 67; *see also id.*, Ex. A, App. B at 70–code 670 ("If return has not posted, credits the Tax Module with prepayment on account").)

34. On May 9, 2000, Mark S. Hamburgh sent Linda Turcotte a letter discussing disposition of the escrow account. He began the letter with the words "I have paid $165,000 out of the escrow to the United States Treasury as a deposit against the federal estate tax." He also told Ms. Turcotte that he had paid $350 out of the escrow funds to cover a debt of the estate, and he asked Ms. Turcotte to countersign his letter "to indicate your consent to my applying the remaining $1,704.19 to my invoice for work on the estate and my disbursements." (Stoddart Decl. Ex. 14, App. B at 55.)

35. On June 30, 2000, Linda Turcotte executed an affidavit as successor trustee of the Philip Goldstein Revocable Trust "for the purpose of inducing MYRNA STONE to consummate her purchase of the [Goldstein property in Florida]." (Stoddart Decl. Ex. 11 at 2, App. B at 46.) In that affidavit, she swore under oath that there were no "federal, state or county tax deficiencies, which could result in a lien or judgment affecting the title to the real or personal property hereinbefore described." (*Ibid*.)

36. Also on June 30, 2000, Linda Turcotte executed a quit-claim deed conveying to Myrna Stone the Florida real property of the Philip Goldstein Revocable Trust. (Stoddart Decl. Ex. 12, App. B at 47-48.)

37. The Estate of Philip Goldstein filed its federal estate-tax form on November 12, 2004. (Stoddart Decl Ex. 1, App. B at 4.)

38. Mark S. Hamburgh signed the estate-tax return as preparer (Stoddart Decl. Ex. 17, App. B at 59) and listed himself on the return as the estate's representative before the IRS; he also noted his "CAF number," 2005-08218R (*id*., App. B at 60).

39. Line 23 of the estate-tax return showed a total tax due of $0, and line 27 showed an "overpayment" of $165,000. (Stoddart Decl. Ex. 17, App. B at 59.) Line 24 reads "Prior payments. Explain in an attached statement." The amount listed on line 24 as "prior payments" is $165,000. The return as filed contains a page captioned "Supporting Documents," and that page states, "A Statement of Prior Payments is hereto annexed as Exhibit B." (*Id*., App. B at 62.) The referenced statement of prior payments reads as follows (*id*., App. B at 65):

STATEMENT OF PRIOR PAYMENTS

| Date | Amount of Payment | Total of Payments |
|---|---|---|
| 5/5/2000 | $165,000 | $165,000 |

40. On April 29, 2005, the IRS sent the estate, through Mark S. Hamburgh, an Estate Tax Closing Document stating that the IRS had determined a net estate tax of $0. (Stoddart Decl. Ex. 15, App. B at 57.)

41. On August 16, 2005, Mark S. Hamburgh faxed a message to the IRS that stated, in part (Stoddart Decl. Ex. 16, App. B at 58):

> The estate received a closing letter, determining the tax to be $0, as set forth on the return.
>
> Upon inquiring by telephone today as to the status of the refund of the overpayment shown on the return, I was informed that it had been disallowed. If this is the case, I would appreciate receiving a written notice to said effect and a specific explanation of the reason(s) therefor. Thank you.

42. On August 29, 2005, the IRS sent a certified letter to the estate, through Mark S. Hamburgh, stating that it could not allow the claimed overpayment because the estate-tax return was postmarked more than three years after the return due date plus any extensions. (Compl. Ex. C.)

43. Joan Huskins is the current personal representative of the Goldstein estate. She replaced her sister, Linda Turcotte, who represented the estate when it made its remittance to the

IRS and who is now deceased. Ms. Huskins has little or no personal knowledge about the remittance. (Stoddart Decl. Ex. 2 at 3, App. B at 12.)

Respectfully submitted,

s/Robert Stoddart
ROBERT STODDART
U.S. Justice Department, Tax Division
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445; FAX: (202) 514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

s/ David Gustafson

October 16, 2006