IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 05-1273 T
(Judge Susan G. Braden)

JOAN HUSKINS, as personal representative of the ESTATE OF PHILIP GOLDSTEIN,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Joan Huskins, as personal representative of the Estate of Philip Goldstein, pursuant to RCFC 56, hereby submits this Memorandum of Law in Opposition to Defendant's motion for summary judgment and brief in support thereof, and states:

## I. PRELIMINARY STATEMENT

While defendant titled its motion a "Motion for Summary Judgment", the relief it requests in its brief (page 31) is dismissal of plaintiff's complaint. A motion to dismiss must be based on the failure to state a cause of action. Clearly a claim to recover a tax deposit is legally sufficient. Defendant has not provided any argument in support of the conclusion that plaintiff's complaint fails to state a cause of action. Defendant's argument is based on its interpretation of the evidence. Accordingly, dismissal of the complaint would be improper as a matter of law.

## II. ISSUE(S) PRESENTED

Plaintiff objects to defendant's portrayal of the issue(s) in this case. In reality, this case involves the single issue: whether the remittance was a deposit or a payment. In its portrayal of what defendant contends to be three separate issues, defendant has distorted plaintiff's position,

FTL:1974196:2

the evidence, the effect of section 6401(c), the operation of Rev. Proc. 84-58, and the holdings of this Court.

Defendant claims that the first issue is "Did the Estate of Philip Goldstein make a deposit of estate taxes rather than a payment simply because it owed no tax even though section 6401(c) of the Internal Revenue Code prevents excess payments from being treated as anything other than 'overpayments' simply because no tax was due?" This is a gross distortion of both plaintiff's position in this case as well as the operation of section 6401(c). It has always been Plaintiff's position that the remittance was a deposit because it did not pay a liability that was shown to be due on a return or a liability that was proposed by the IRS. These are the only material facts and they are undisputed. Plaintiff's position would be the same whether or not tax was owed.

In any event, section 6401(c) never "prevents" a remittance from being treated as a deposit. It says that "An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid." In other words, a remittance which, under the facts and circumstances, constitutes a payment when made will not be treated as a deposit solely by reason of the fact that no tax is due. Section 6401(c) has no application to deposits and it plays no role in characterizing the remittance as a payment or a deposit when it is made.

Defendant claims that the second issue is "Did the Estate of Philip Goldstein make a deposit of estate taxes rather than a payment even though the estate remitted the money without contest after making a good faith estimate of its liability, which is the type of remittance the Court of Claims considered to be a payment?" This is a gross distortion of the undisputed facts, as well as the cases characterizing remittances as deposits or payments.

The remittance was not a good faith estimate of the tax liability. It was the proceeds of the sale of a condominium unit. The only tax computations were based on various hypothetical scenarios to illustrate that, in a worst case scenario, the estate's tax liability could exceed the amount of those sales proceeds. The computations showed how, under the escrow agreement, all of the sales proceeds had to be held in escrow to provide for the title insurance company's exposure for omitting the exception for the lien for any death taxes that might be owed. The computations ignored all of the deductions to which the estate was entitled and assumed that the estate won 100% of every issue that was then the subject of ongoing litigation. There was no relationship whatsoever between what the estate owed, or what it believed that it owed, and the amount of the remittance.

Under the Court of Claims cases, a remittance which does not discharge a liability that was shown to be due on a return or a liability that was proposed by the IRS, is a "disorderly remittance" or "dumping of funds", which constitutes a deposit. It is undisputed that plaintiff never filed a return in which any liability was shown to be due. It is also undisputed that the IRS never proposed a liability of the estate.

The Claims Court cases involving "contested liabilities" all involve remittances which discharged a liability that was proposed by the defendant, generally in a notice of deficiency. The Court said that, even in those circumstances, a remittance will constitute a deposit where the taxpayer expresses his intent to contest the liability. The "contested liability" rule treats remittances that would otherwise constitute payments as deposits. It does not operate to treat remittances that are otherwise deposits as payments. Where, as here, the defendant has not proposed a liability, the issue of contest is never reached.

Defendant claims that the third issue is "Did the Estate of Philip Goldstein make a deposit of estate taxes rather than a payment even though it failed to designated [sic] the remittance as a deposit in compliance with a published IRS revenue procedure that governs characterization of remittances as deposits?" It is interesting that defendant concedes that Rev. Proc. 84-58 governs the characterization of the remittance here without mentioning it by name or addressing its content any where else in its brief.

Rev. Proc. 84-58 does not provide, as defendant suggests, that every remittance not designated as a deposit will be regarded as a payment. Rev. Proc. 84-58 does not apply to remittances which discharge liabilities that are shown to be due on a return, but it applies to all others. Its operation is mechanical and provides the taxpayer with very little opportunity to influence the characterization of the remittance. It characterizes every remittance as a deposit, regardless of how or whether it is designated, unless the remittance pays in full a liability that was proposed by the IRS in writing.[1] If the remittance pays in full a liability that was proposed by the IRS in writing, it will be regarded as a payment unless the taxpayer designates it as a "deposit in the nature of a cash bond". This is the only circumstance under which the taxpayer's designation of a remittance as a deposit will be given effect.

If the remittance is less than the entire amount of the tax liability that is proposed by the IRS in writing, Rev. Proc. 84-58 requires that it be treated as a deposit unless the taxpayer specifically indicates that he intends that it be applied as a payment and specifically indicates

[1] This revenue procedure treats all remittances as deposits except in these very narrow circumstances because doing so furthers the IRS' best interests. Historically, the IRS has argued that remittances are deposits so that it does not have to pay interest on the remittance for the time that it was in the IRS' possession. It has taken the opposite position, and treated such remittances as payments, only in cases in which the statute of limitations would bar a claim for refund of an overpayment. If this remittance were a payment, it is difficult to imagine one that would not be. Treating all such remittances as interest-bearing payments would create bad policy that would operate to the defendant's detriment.

which portion of the liability it is to pay. This is the only circumstance under which the taxpayer may designate any portion of his remittance as a payment. If there is any doubt about the portion to be paid, it is to be treated as a deposit.

## II. MEMORANDUM OF LAW AND ARGUMENT

### A. Section 6401(c) has no application to this case.

Defendant devotes a large portion of its brief to the argument that section 6401(c), and its predecessor, section 3770(c) of the 1939 Code, "prevents" excess remittances from being treated as deposits. In fact, defendant claims in note 2, on page 15, of its brief that section 6401(c) governs this case.[2] Section 6401(c) provides in its entirety as follows:

> An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid.

By its own terms, section 6401(c) only applies to "an amount paid as tax." It has no application to an amount remitted as a deposit. The Court found in *Charles Leich and Co. v. United States,* 165 Ct. Cl. 127 (1964), that section 3770(c), and therefore section 6401(c), provides little or no help in determining whether a remittance is a payment or a deposit. The Court said that the surrounding factors which prompt the taxpayer to make the remittance, and the taxpayer's actions surrounding the remittance, are usually determinative of the question of whether the remittance is a payment or a deposit. The Court's careful analysis of section 3770(c) in *Leich* led it to conclude that the remittance was a deposit. In short, it rejected defendant's argument that section 6401(c) "prevents" the treatment of excess remittances as deposits.

Section 6401(c) simply provides that a remittance which, based on all of the facts and circumstances, constitutes a payment will not be treated as a deposit solely by reason of the fact

[2] Contrast this with defendant's statement on page 2 of its Brief that the IRS revenue procedure governs the characterization of remittances as deposits.

that the taxpayer did not owe any tax. Its predecessor, section 3770(c) of the 1939 Code, was enacted to stop the IRS from refusing to pay interest on estimated tax payments whenever it turned out that the taxpayer owed no tax.

Defendant makes the interesting claim on page 15 of its brief that the enactment of section 6401(c), along with some other unidentified "relevant statute" that "cannot apply" "nullified the estate's reading of *Rosennan*" without explaining how such enactment accomplished that result or how defendant believes that plaintiff reads *Rosenman v. United States,* 323 U.S. 658 (1945). Plaintiff reads *Rosenman* as holding that a taxpayer's remittance which "did not discharge what he deemed a tax liability nor pay one that was asserted" but which was merely an "interim arrangement to cover whatever contingencies the future might define", is a deposit. That is how it has been read by many courts, including this Court, long after section 6401(c) was enacted.

The cases that address the predecessor of section 6401(c), section 3770(c) of the 1939 Code, did so to resolve issues that are not involved in this case. In *Leich* and *Northern Natural Gas Co. v. United States,* 173 Ct. Cl. 881 (1965), for example, the Court examined section 3770(c) to determine its effect, if any, on a remittance that was made in response to a deficiency that was proposed by the defendant.

Defendant also cites section 6401(c) in support of its argument that a taxpayer can not redesignate a payment as a deposit after it is made. Defendant represents on page 3 of its brief that "The estate now wants to recharacterize what it once considered to be a payment as a 'deposit in the nature of a cash bond' because no similar statute of limitations restricts the return of a deposit". Defendant's contention that the estate intended that the remittance be treated as a payment when it was made is false. It has always been plaintiff's position that the remittance was

a deposit when made. In any event, Rev. Proc. 84-58 requires that this remittance be treated as a deposit regardless of how the plaintiff intended that it be treated.

**B. The remittance was a deposit, not a tax payment, when made**

Based on a tortured reading of *Leich* and *Northern Natural Gas Co.*, defendant claims that every remittance constitutes a payment unless the taxpayer makes it under protest and expresses his intention to contest something, but it is not clear what defendant has in mind where, as here, the IRS has not proposed a liability to contest. This exposes a misunderstanding of how the rule of contested liabilities evolved after *Rosenman.*

Since defendant never proposed a tax liability in this case, under *Rosenman,* the remittance was necessarily a deposit unless it discharged what the taxpayer deemed to be its tax liability. In contending that the remittance was equal to the plaintiff's "good faith estimate" of its federal estate tax liability, defendant argues that the remittance discharged what the plaintiff deemed to be its tax liability. However, this argument suffers from two fatal flaws. First, it relies on the factual premise that plaintiff reasonably believed that it owed the taxes that were revealed by Mr. Hamburgh's computations. This factual premise is directly refuted by the undisputed evidence. Second, an estate is deemed to owe only that tax liability that is shown to be due on Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, or Form 4768, Application for Extension of Time To File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes. The estate is not deemed to owe an amount reflected only in its attorney's private work papers. It is undisputed that the estate never filed Form 4768 and that its Form 706 disclosed no tax liability.

*1. The amount of the remittance was not a good faith estimate of the estate's federal estate tax liability*

In this case it is undisputed that the IRS never asserted a tax liability of the estate. *Rosenman* holds that any remittance which does not pay a tax liability that was asserted by the IRS will necessarily constitute a deposit unless it discharges what the taxpayer deems to be its tax liability. Defendant claims that the remittance was a "good faith estimate of its liability" and that it therefore discharged what the estate deemed to be its federal estate tax liability.

The computations performed by Mr. Hamburgh clearly were not a "good faith estimate" of the estate's liability and the remittance bore no relationship to what the estate believed it owed or what it actually owed. The remittance was simply the net proceeds from the sale of the condominium. The estate's actual federal and state estate tax liabilities could not be determined because they depended on the outcome of ongoing litigation.

The estate owned a condominium unit that it wanted to sell. Title was encumbered by the lien provided under section 6324 for whatever federal estate taxes might be owed. The condominium could not have been sold if the title insurance policy had included an exception to coverage for that lien. The title insurance company agreed to omit the exception, so that the condominium could be sold, provided that the proceeds from the sale of the condominium were held in escrow to provide for any liability that the title insurance company incurred for omitting the exception. If the estate could show that its potential liability exposure for all federal and state death taxes in a worst case scenario was less than the proceeds from the sale of the condominium, the title insurance company agreed that the lesser amount could be held in escrow. Mr. Hamburgh performed the purely mechanical computations of federal and New York taxes, penalties and interest to illustrate the estate's potential exposure to death taxes in each of three hypothetical scenarios. As he indicated in paragraph 3 of his affidavit dated April 10, 2000, (Exhibt "E", Hamburgh's Affidavit) his computations were solely for the limited purpose

determining that exposure. He made it clear that the actual tax liability was subject to various unresolved factors and that the estate was not committed to these figures in any way.

Mr. Hamburgh performed the computations based on hypothetical estates of $1,194,000, $1,074,000 and $1,000,000. The first scenario would have been the value of this estate if (i) it included the decedent's brother's share of the mortgage, (ii) the value of the mortgage was the value of the mortgaged property; (iii) the broker's $580,000 valuation of the mortgaged property was sustained, and (iv) none of the expenses incurred by the estate were deducted. This computation assumed that each issue involved in the ongoing litigation would be resolved 100% in favor of the estate and represented the worst case scenario from an estate tax perspective. The second scenario is based on the same assumptions as the first except that the value of the mortgaged property was arbitrarily assumed to be $460,000. The third computation assumed, without explanation, a hypothetical estate of exactly $1,000,000.

Mr. Hamburgh's computations reveal federal estate tax liabilities, including penalties and interest, under the various scenarios of $245,791, $184,905 and $157,894, respectively. He computed New York estate taxes of $13,716 under the first scenario and $12,698 under the second scenario. He did not compute the estate's Florida estate tax liabilities under any scenario. Only the first computation (the worst case scenario) was used. Defendant's claim that these computations revealed what Mr. Hamburgh reasonably estimated to be a federal estate tax liability of $165,000 is based on nothing more than defendant's claim that the taxes, penalties and interest computed under each of the last two scenarios ($184,905 and $157,894), both of which were ignored for purposes of the affidavit, average $165,000. (Def. Brief, p. 6). In fact, they average $171,399.50.

Mr. Hamburgh was representing the estate in the litigation involving the decedent's brother's interest in the mortgage and the value of the mortgage and mortgaged property. He knew that it was unlikely that each of those issues would be resolved 100% in favor of the estate. Mr. Hamburgh knew that the estate was entitled to deductions which his computations did not take into account. Ultimately, (i) the value of the mortgage was determined to equal the value of the mortgaged property; (ii) the mortgaged property was determined to have a value of $340,144; (iii) decedent's brother was determined to own 50% of the mortgage; and (iv) the estate was determined to have $132,000 of allowable deductions. As the result of these determinations, the estate had no estate tax liability.

Clearly, the computations did not reveal what Mr. Hamburgh estimated to be the estate's federal and state estate tax liability. The purpose of the computations was to illustrate that the title insurance company's worst case exposure for omitting the exception was no less than the sales price of the condominium. They illustrated how all of the net proceeds from the sale of the condominium, totaling $168,480, had to be held in escrow to provide for that exposure. However, because Ms. Turcotte was willing to execute an "undertaking" to personally pay any shortfall, the title insurance company was satisfied with having $165,000 of the net sales proceeds held in escrow.

The escrow agreement permitted, but did not require, the escrow agent to apply the escrowed funds to federal and state estate taxes, because the title insurance company's liability exposure would be reduced by every dollar so applied. The sole purpose of the escrow was to provide for the title insurance company's exposure without having to pay the undetermined amount of federal or state estate taxes.

Even though there was no obligation to apply any portion of the escrowed funds to federal or state estate taxes, Mr. Hamburgh believed that depositing them with the IRS to stop the accrual of interest and penalties on whatever estate tax might ultimately be determined to be owed (depending on the outcome of the litigation), was a more prudent use of the funds than having them sit in his IOLA trust account. Whatever interest is earned on deposits in such an account must be paid into the IOLA Fund for use in funding grants to various legal service organizations. While Mr. Hamburgh knew that the estate would not earn any interest on the excess of the remittance over the amount of any tax that was ultimately determined to be owed, the estate would not earn any interest if the funds remained in his IOLA trust account. Accordingly, there was no down side to depositing the entire amount with the IRS, even if it turned out that the estate owed no tax. If, on the other hand, it turned out that the estate owed tax, the deposit would have stopped any further accrual of interest and delinquency penalties. The estate had everything to gain and noting to lose by remitting the sales proceeds as a deposit.

Consequently, Mr. Hamburgh deposited the entire $165,000 with the IRS to be applied to any taxes that might be owed. He specifically advised the IRS that the estate tax return had not been filed. In a letter he sent to Ms. Turcotte just four days later, Mr. Hamburgh specifically referred to the remittance as a "deposit against estate tax." (See Hamburgh's letter to Turcotte dated May 9, 2000, Exhibit "K" to Hamburgh's affidavit).[3]

*2. A taxpayer is deemed to owe only that liability that is shown to be due in its return.*

---

[3] In the letter, Mr. Hamburgh wrote to Ms. Turcotte, "I have paid $165,000 out of the escrow to the United States Treasury as a deposit against the federal estate tax." Defendant represents that the letter informed Linda Turcotte that Mr. Hamburgh had released part of the escrow "to pay a debt of the estate". (Def. Brief. p. 7, 9).

In *Leich,* the Court said "It seems clear that a remittance made by a taxpayer of an amount shown in good faith to be due on its tax return or given in response to an assessment of taxes by the Internal Revenue Service is a payment of tax." It is clear from this statement, which paraphrases the rule of *Rosenman,* that the Court interprets *Rosenman* as holding that a remittance discharges what the taxpayer deems to be a liability only if, and to the extent, that liability is "shown in good faith to be due on its tax return."

In *Leich,* the IRS had proposed specific tax deficiencies which the taxpayer protested but discharged by payment in full. Because the remittance paid a tax liability that the IRS had proposed in writing, those remittances would have constituted payments under Rev. Proc. 84-58 and *Rosenman.* The Court nevertheless held that the remittance was a deposit after distinguishing *Reading Co. v. United States*, 120 Ct. Cl. 223 (1951), on the grounds that the remittance in *Leich* was "of an amount not shown to be due on its return", again making it clear that remittance will constitute a deposit where it does not discharge a liability that the taxpayer has shown to be due on its return.

This Court has consistently said that any remittance that does not pay a liability that the taxpayer has shown to be due on a return, or that was proposed by the IRS, is a "disorderly remittance" or a "dumping" of funds on the IRS. Such disorderly remittances necessarily constitute deposits and not interest bearing tax payments. This is consistent with the position that the defendant has historically taken in cases in which a refund of an overpayment was not barred by the statute of limitations. In *Northern Natural Gas Co.*, for example, the defendant argued that a remittance was a non-interest bearing deposit, rather than a tax payment. Based on *Rosenman,* defendant argued that "there can be no overpayment unless money is remitted with a