IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1273 T
(Judge Susan G. Braden)

JOAN HUSKINS, as personal representative of the ESTATE OF PHILIP GOLDSTEIN,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Plaintiff, Joan Huskins, as personal representative of the Estate of Philip Goldstein, pursuant to RCFC 56, hereby submits her Opposition to Defendant's proposed findings of uncontroverted facts, and states:

1. *Philip Goldstein died on September 22, 1998. (Compl. ¶4.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

2. *Philip Goldstein's legal residence at the time of his death was Broward County, Florida. (Stoddart Decl. Ex. 17, App. B at 59.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

3. *On August 21, 1998, Philip Goldstein had executed an amended trust agreement to create a revocable inter vivos trust, the Philip Goldstein Revocable Trust. He served as both grantor and trustee. (Stoddart Decl. Ex. 13 at 1, App. B at 49.)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact as stated and alternately proposes the following:

On August 21, 1998, Philip Goldstein executed the Philip Goldstein Revocable Trust, creating and inter vivos trust, under which Mr. Goldstein served as both grantor and trustee.

This trust revoked in its entirety, the prior trust established by Mr. Goldstein on May 27, 1998, and was not a mere amendment thereto.

4. *Philip Goldstein was the sole beneficiary of the trust during his lifetime. (Stoddart Decl. Ex. 2, 4-5, App. B. at 50, 52-53.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

5. *When Philip Goldstein died, Linda Turcotte became the successor trustee of the Philip Goldstein Revocable Trust under its provisions. (Stoddart Decl. Ex. 13 at 2-4, App. B at 50-52; Ex. 11, App. B at 45.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

6. *At the time of Philip Goldstein's death, the Philip Goldstein Revocable Trust held all the assets listed on Schedule G of the federal estate-tax form eventually filed by the Estate of Philip Goldstein, and the Philip Goldstein Revocable Trust was the sole beneficiary of Philip Goldstein's will. (Stoddart Decl. Ex. 17, App. B at 64.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

7. *On February 2, 2000, Linda Turcotte, as trustee, entered a contract to sell real estate in Broward County, Florida, to Myrna Stone. (Stoddart Decl. Ex. 3, App. B at 15.) The closing was to occur on or about August 1, 2000. (Ibid., § VI, App. B at 15.)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact and alternately proposes the following:

"On February 16, 2000, Linda Turcotte, as Trustee, accepted an offer dated February 2, 2000, and executed a contract to sell real estate in Broward County, Florida, to Myrna Stone. The closing was to occur on or about August 1, 2000."

8. *On February 19, 2000, Linda Turcotte, as personal representative of the estate of Philip Goldstein, entered a contract to sell a condominium unit located in the Westhampton Landings condominium in Suffolk County, New York (hereinafter the Westhampton condominium). The purchasers were to be George and Joy Busler (Stoddart Decl. Ex. 4, App. B at 16.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

9. *The contract provided that the sale was to close on March 1, 2000, but that time was not of the essence. (Stoddart Decl. Ex. 4, § 4. 1, App. B at 17.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

10. *A rider to the contract provided: "The Purchasers shall notify the Seller in advance of the closing of any defects in title. Seller shall have a reasonable time to correct same..." (Stoddart Decl. Ex. 4, App. B at 20.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

11. *The contact required the Buslers to complete the purchase despite (1) any defect in title "that a title insurance company would ordinarily insure against without additional premium" (Stoddart Decl. Ex. 4, § 2.6.8, App. B at 16); and (2) any "lien for which the Buyer is allowed a credit under Paragraph 3.4" (Stoddart Decl. Ex. 4, § 2.6.9, App. B at 16). Paragraph 3.4 allows a credit for a lien only if the lien is "immediately satisfiable by the payment of a sum of money." (Stoddart Decl. Ex. 4, App. B at 17.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

12. *William F. Bates represented the estate of Philip Goldstein in connection with the sale of the Westhampton condominium. (Stoddart Decl. Ex. 2 at 2, App. B at 11.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

13. *The estate of Philip Goldstein retained Mark S. Hamburgh, Esquire, to prepare the estate-tax returns. (Stoddart Decl. Ex. 2 at 1, App. B at 10.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

14. *On March 10, 2000, William F. Bates's legal assistant sent Mark S. Hamburgh an exception sheet from the title company involved in the "Sale to Busler" (Stoddart Decl. Ex. 5, App. B at 24.) The exception stated, in part: "Company. . . requires . . . proof of payment of both New York and Federal Estate Taxes on the Estate of Philip Goldstein." (Id., App. B at 24.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

15. *On April 10, 2000, Mark Hamburgh executed an affidavit to induce the Aquebogue Abstract Corp. (the title company) "to omit Exception No. 19, relating to the lien of federal and state taxes from its title report…" (Stoddart Decl. Ex. 6 at 3, App. B at 28.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

16. *In his affidavit, Mr. Hamburgh listed the estate's assets and their approximate valuations and stated:*

> *Based upon the foregoing estimates, I estimate that the gross estate for federal estate tax purposes is $1,194,000. I calculate the federal estate tax on an estate of $194,000 to be $178,474. [footnote omitted] Were this the tax on the Estate, there would be a late filing penalty of $44,619. [footnote omitted] There would also be a late payment penalty of .5% per month that the payment is overdue, which at this point in time is 10 months, for a total penalty of 5% or $8,924. Thus, on an estate of $1,194,000 I calculate the amount due as of today to be $232,017 plus interest.*

*In one of the omitted footnotes, Mr. Hamburgh notes that the actual tax would be computed on the taxable estate, which is the gross estate minus allowable deductions; when he estimated the estate tax, he disregarded possible deductions. (Stoddart Decl. Ex. 6 at 2, App. B at 27.)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact and alternately proposes the following:

"In his affidavit of April 10, 2000, Mr. Hamburgh listed the estate's assets and their approximate valuations and stated:

> '3. The above figures are estimates submitted solely for the purpose of this Affidavit. The exact estate tax valuations of the various assets are subject to various factors. The Affidavit is made without prejudice to any position the Estate ultimately takes on or in connection with any federal, New York and/or Florida estate tax and/or estate tax return.
>
> 4. Based upon the foregoing estimates, I estimate that the gross estate for federal estate tax purposes is $1,194,000. I calculate the federal estate tax on an estate of $1,194,000 to be $178,474. [footnote no. 2 omitted from this quote] Were this the tax on the Estate, there would be a late filing penalty of $44,619. [footnote no. 3 omitted from this quote] There would also be a late payment penalty of .5% per month that the payment is overdue, which at this point in time is 10 months, for a total penalty of 5% or $8,924. Thus, on an estate of $1,194,000 I calculate the amount due as of today to be $232,017 plus interest.'

In footnote number 2 to his Affidavit of April 10, 2000, Mr. Hamburgh notes that 'The actual tax is calculated on the <u>taxable</u> estate, which is the gross estate minus allowable deductions, such as for funeral and administration expenses and debts of the decedent. I have calculated the tax as if the gross estate were the taxable estate; i.e., I have disregarded all deductions.'"

17. *Mark S. Hamburgh never requested an extension of time in which to file the estate-tax return for the Goldstein estate. (See Stoddart Decl. Ex. 1, App. B at 4.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

18. *In his affidavit of April 10, 2000, Mr. Hamburgh stated that he represented the estate in a mortgage foreclosure action (Stoddart Decl. Ex. 6 at 1, App. B at 26), and he listed the mortgage as an estate asset, assigning it a value of $580,000. He noted that this amount was the estimated value of the underlying property and that the mortgage was non-recourse. (Id. at 2, App. B at 27)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

19. *In April of 2000, Mr. Hamburgh produced handwritten computations of possible estate-tax liability for the estate of Philip Goldstein. (Stoddart Decl. Ex. 2 at 1, App. B at 10.) The computations appear as Exhibit 7 of the Stoddart Declaration, App. B at 29-33. (Stoddart Decl. ¶ 3, App. B at 2.) The estate refers to them as "computations of the worst-case scenario estate tax liability." (Id. Ex, 2 at 3, App. B at 12.)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact, and states as follows:

Mr. Hamburgh's computations were not of the estate's "possible estate-tax liability". They did not bear any relationship to what the estate believed or estimated to be its actual federal estate tax liability. The estate's actual federal and state estate tax liabilities could not be determined because they depended on the outcome of ongoing litigation.

The estate owned a condominium unit that it wanted to sell. Title was encumbered by the lien provided under section 6324 for whatever federal estate taxes might have been owed. The condominium could not have been sold if the title insurance policy had included an exception to coverage for that lien. The title insurance company agreed to omit the exception, so that the condominium could be sold, provided that the proceeds from the sale of the condominium were held in escrow to provide for any liability that the title insurance company incurred for omitting the exception. If the estate could show that its potential liability exposure for all federal and state death taxes in a worst case scenario was less than the proceeds from the sale of the condominium, the title insurance company agreed that the lesser amount could be held in escrow. Mr. Hamburgh performed the purely mechanical computations of federal and New York taxes, penalties and interest to illustrate the estate's potential exposure to death taxes in each of three

FTL:1974371:1

hypothetical scenarios. As he indicated in paragraph 3 of his affidavit dated April 10, 2000, (Exhibit "E", Hamburgh's Affidavit) his computations were solely for the limited purpose determining that exposure. He made it clear that the actual tax liability was subject to various unresolved factors and that the estate was not committed to these figures in any way.

Mr. Hamburgh performed the computations based on hypothetical estates of $1,194,000, $1,074,000 and $1,000,000. The first scenario would have been the value of this estate if (i) it included the decedent's brother's share of the mortgage, (ii) the value of the mortgage was the value of the mortgaged property; (iii) the broker's $580,000 valuation of the mortgaged property was sustained, and (iv) none of the expenses incurred by the estate were deducted. This computation assumed that each issue involved in the ongoing litigation would be resolved 100% in favor of the estate and represented the worst case scenario from an estate tax perspective. The second scenario is based on the same assumptions as the first except that the value of the mortgaged property was arbitrarily assumed to be $460,000. The third computation assumes a hypothetical estate of exactly $1,000,000. None of the assumptions upon which this figure is based are disclosed in Mr. Hamburgh's workpapers.

Mr. Hamburgh's computations reveal federal estate tax liabilities, including penalties and interest, under the various scenarios of $245,791, $184,905 and $157,894, respectively. He computed New York estate taxes of $13,716 under the first scenario and $12,698 under the second scenario. He did not compute the estate's Florida estate tax liabilities under any scenario. Only the first computation (the worst case scenario) was used. Defendant's claim that these computations revealed what Mr. Hamburgh reasonably estimated to be a federal estate tax liability of $165,000 is based on nothing more than defendant's claim that the taxes, penalties and interest computed under each of the last two scenarios ($184,905 and $157,894), both of

which were ignored for purposes of the affidavit, average $165,000. (Def. Brief, p. 6). In fact, they do not. They average $171,399.50.

Mr. Hamburgh was representing the estate in the litigation involving the decedent's brother's interest in the mortgage and the value of the mortgage and mortgaged property. He knew that it was unlikely that each of those issues would be resolved 100% in favor of the estate. Mr. Hamburgh knew that the estate was entitled to deductions which his computations did not take into account. Ultimately, (i) the value of the mortgage was determined to equal the value of the mortgaged property; (ii) the mortgaged property was determined to have a value of $340,144; (iii) decedent's brother was determined to own 50% of the mortgage; and (iv) the estate was determined to have $132,000 of allowable deductions. As the result of these determinations, the estate had no estate tax liability.

Clearly, the computations did not reveal what Mr. Hamburgh estimated to be the estate's federal and state estate tax liability. The purpose of the computations was to illustrate that the title insurance company's worst case exposure for omitting the exception was no less than the sales price of the condominium. They illustrated how all of the net proceeds from the sale of the condominium, totaling $168,480, had to be held in escrow to provide for that exposure. However, because Ms. Turcotte was willing to execute an "undertaking" to personally pay any shortfall, the title insurance company was satisfied with having $165,000 of the net sales proceeds held in escrow.

The escrow agreement permitted, but did not require, the escrow agent to apply the escrowed funds to federal and state estate taxes, because the title insurance company's liability exposure would be reduced by every dollar so applied. The sole purpose of the escrow was to

provide for the title insurance company's exposure without having to pay the undetermined amount of federal or state estate taxes.

Even though there was no obligation to apply any portion of the escrowed funds to federal or state estate taxes, Mr. Hamburgh believed that depositing them with the IRS to stop the accrual of interest and penalties on whatever estate tax might ultimately be determined to be owed (depending on the outcome of the litigation), was a more prudent use of the funds than having them sit in his IOLA trust account. Whatever interest is earned on deposits in such an account must be paid into the IOLA Fund to fund grants to various civil legal service organizations. While Mr. Hamburgh knew that the estate would not earn any interest on the excess of the remittance over the amount of any tax that was ultimately determined to be owed, the estate would not earn any interest if the funds remained in his IOLA trust account. Accordingly, there was no down side to depositing the entire amount with the IRS, even if the estate owed no estate tax liability. If, on the other hand, the estate owed tax, the deposit would have stopped the accrual of interest and delinquency penalties if it were ultimately applied to pay that liability. Consequently, he deposited the entire $165,000 with the IRS to be applied to any taxes that might be owed. He specifically advised the IRS that the estate tax return had not been filed. In a letter he sent to Ms. Turcotte just four days later, Mr. Hamburgh specifically referred to the remittance as a "deposit against estate tax." (See Hamburgh's letter to Turcotte dated May 9, 2000, Exhibit "K" to Hamburgh's affidavit).

20. *In a computation dated April 10, 2000, Mr. Hamburgh calculated the estate tax on 1,194,000 by adding 345,800 to 41% of 194,000 (the gross estate, 1,194,000, minus 1,000,000). This computation resulted in a total of 425,340, from which Mr. Hamburgh subtracted 202,050 (which he captioned "UC" [unified credit]), to reach a result of 223,290.*

FTL:1974371:1

*From this sum he subtracted 44,816 (which he captioned "SDTC" [state death-tax credit]) and reached a result of 178,474. To this amount he added a late-filing penalty of 22.5% (44,619), and a late-payment penalty of .5% / month for 10 months, or 5% of the total (8,924), to reach an estate tax of 232,017. (Mr. Hamburgh originally wrote "25%" after the entry "Late filing" but he crossed it out and wrote "22.5%" instead.) To his result of 232,017 he added 13,774, which he captioned "Interest - per Kim Diforbio [spelling unclear] of IRS as of 4/30/00." The final result was 245,791. (Stoddart Decl. Ex. 7, App. B at 29.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

21. *On the same page (App. B at 29), Mr. Hamburgh captioned a group of equations "SDTC on 1,134,000." In those equations he adds 38,800 to 6.4% of 94,000 (which the difference between 1,134,000 and 1,040,000). The result is 44,816, the "STDC."*

Plaintiff agrees with this proposed finding of uncontroverted fact.

22. *In a computation dated April 14, 2000, in which he followed the same mathematical procedures he had followed on April 10, Mr. Hamburgh calculated an estate tax, plus interest, of $184,905. The calculation begins with the caption "Assets – it mtge [mortgage] is $460,000." The assets, so adjusted equal $1,074,000. (Stoddart Decl. Ex. 7, App. B at 31.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

23. *Mr. Hamburgh also considered the estate tax on what he captioned "Hypo[thetical] estate of $1,000,000." Following the mathematical procedures by which he had produced the preceding two computations, he calculated a federal estate tax of $110,550 for this hypothetical estate. He also calculated a late-filing penalty of $27,638 and a late-payment penalty of $7,186. (Stoddart Decl. Ex. 7, App. B at 33.)*

FTL:1974371:1