Plaintiff agrees with this proposed finding of uncontroverted fact.

24. *On April 10, 2000, Mark S. Hamburgh, the estate of Philip Goldstein (through Linda Turcotte), and the Aquebogue Abstract Corp. entered an escrow agreement, with Mr. Hamburgh as escrowee, under which Aquebogue agreed to omit the exception for the lien of federal and New York estate taxes in exchange for the establishment of account that would hold the net proceeds from the sale of the Westhampton condominium. (Stoddart Decl. Ex. 8 at 1-3, App. B at 34-36.) The parties desired "to cause the Exception to be omitted so that Buster is not justified in refusing to close on the sale," (Id. at 2, App. B at 35.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

25. *Paragraph 6 of the escrow agreement provides (Stoddart Decl. Ex. 8 at 3, App. B at 36):*

> *Escrowee may, at any time and from time to time, apply all or part of the Escrow to the payment of the federal estate tax and/or penalties and interest thereon ... and/or New York State estate tax and/or penalties and interest thereon .... This includes payment of any amount that may ultimately be determined to have been an overpayment.*

Plaintiff agrees with this proposed finding of uncontroverted fact.

26. *Paragraph 7 of the escrow agreement provides that the escrowee could release the remainder of the escrow to the estate only "[u]pon the occurrence of both of the following": (a) a discharge of the property from the lien of the Federal Estate Tax, a closing letter issued by the IRS, or "other proof of full payment of the Federal Estate Tax, reasonably satisfactory to Aquebogue"; and (b) similar proof that the New York Estate Tax had been paid. The paragraph concluded, "However, until the occurrence of both (a) and (b) Escrowee shall not release any part of the Escrow to the Estate or for any other purpose to the benefit of the Estate." (Id. at 3-4, App. B at 36-37.)*

FTL:1974371:1

Plaintiff agrees with this proposed finding of uncontroverted fact.

27. *On April 11, 2000, Linda Turcotte executed an affidavit "to induce Aquebogue Abstract Corp. to insure title to the property [the Westhampton condominium] in the purchasers against the lien of the....estate taxes." (Stoddart Decl. Ex. 9, App. B at 42-43.) In that affidavit, Linda Turcotte swore under oath "That she acknowledges that the estate is obligated to pay federal and New York estate taxes as a result of the death of Philip Goldstein, and that the net proceeds of the sale of said real estate may be insufficient to pay the total amount of such taxes that are due and payable." If the proceeds of the sale were insufficient to pay the taxes, she pledged to pay the deficiency either from the Philip Goldstein revocable Trust or from her personal funds. (Ibid.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

28. *On May 5, 2000, Linda Turcotte sent Mark S. Hamburgh a letter on the stationery of her Florida attorney Richard Goldstone. She sent the letter by fax and by regular mail. In that letter she stated (Stoddart Decl. Ex. 10, App B at 44):*

> *Please consider this as my authorization and letter of instructions to pay pending estate taxes for the Estate of Philip Goldstein.*
>
> *I am aware that you are presently holding approximately $167,000.00 as proceeds of sale from the closing of the estate's real property in Westhampton Beach, New York. The sum of $165,000.00 should be applied to pay Federal Estate Taxes and/or New York Estate Taxes as soon as possible. Please discuss and determine the payment/s to Internal Revenue Service and the State of New York and the amount or amounts thereof, between yourself and my Florida attorney, Richard Goldstone. Your mutual decision who to pay and how much to pay will be acceptable to me.*

Plaintiff agrees with this proposed finding of uncontroverted fact.

29. *Also on May 5, 2000, Mark S. Hamburgh sent the IRS a check for $165,000 from the escrow funds held in his IOLTA account. The check bore the notation "Estate*

FTL:1974371:1

*Tax/Philip Goldstein" and the estate's tax identification number. The IRS stamped the check as received on May 5, 2000. (Compl. Ex. A, second page.) Mr. Hamburgh sent the check with a cover letter, also dated May 5, 2000. The letter stated (Compl. Ex. A, first page):*

> *In accordance with our telephone conversation on April 13, 2000, I attach my Attorney IOLTA Account check no. 1229, payable to the United States Treasury, in the amount of $165,000. This payment is to be applied to the estate tax on the estate of the above-named decedent.*

*The Form 706 [estate-tax return] has not yet been filed.*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact, and states as follows:

As clearly stated on the face of Mr. Hamburgh's correspondence of May 5, 2000, the check was hand delivered to the IRS office located at 110 West 44th Street, New York, NY. Further, Mr. Hamburgh's letter of May 5, 2000, refers to the escrow funds held in Mr. Hamburgh's "IOLA Account", not an "IOLTA Account" as referenced by defendant in the foregoing proposed finding of uncontroverted fact. The term "IOLA Account" stands for "Interest on Lawyer Account Fund" and is required to be maintained by members of the New York State Bar Association. Accordingly, the foregoing proposed finding of uncontroverted fact should read as follows:

"On May 5, 2000, Mark S. Hamburgh hand delivered a check to the IRS office located at 110 West 44th Street, New York, NY, for $165,000 from the escrow funds held in his IOLA account. The check bore the notation "Estate Tax/Philip Goldstein" and the estate's tax identification number. The IRS stamped the check as received on May 5, 2000. Together with the check, Mr. Hamburgh delivered a cover letter which stated :

> 'In accordance with our telephone conversation on April 13, 2000, I attach my Attorney IOLA Account check no. 1229, payable to the United States Treasury, in the amount of $165,000. This payment is to be applied to the estate tax on the estate of the above-named decedent.
>
> The Form 706 [estate-tax return] has not yet been filed.'"

30. *The IRS posted the remittance to the account of the Goldstein estate as a "subsequent payment," using the code number 670. (Stoddart Decl. Ex. lA App B at 9.) This code is one of the master codes that IRS personnel use to enter data into the IRS's computerized records. (Kelly Decl. ¶ 1, App. B at 66.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

31. *The code number 670 denotes only payments; it never indicates a deposit in the nature of a cash bond. (Id. ¶4, App. B at 67.)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact, and states as follows:

The statement that code number 670 denotes only payments and never indicates a deposit in the nature of a cash bond is false. In *U.S. v. Tate & Lyle North American Sugars, Inc.*, 90 AFTR 2d 2002-6485 (S.D.N.Y. 2002), *aff'd, U.S. v. Domino Sugar Corp.*, 92 AFTR 2d 2003-6936 (2d Cir. 2003), the issue was whether a remittance which the IRS had coded "670 - subsequent payment" was a payment or a deposit. It was held to be a deposit.

In this case, the IRS clearly did not regard the remittance as a payment of estate tax. If it had, the IRS would have coded it 660 and assessed the corresponding amount of estate tax liability under section 6213(b)(4). It is undisputed that the remittance was never coded as an estate tax payment and that the IRS never assessed any amount of estate tax. Furthermore, the coding of this remittance as a "670 – subsequent payment" was patently erroneous. A subsequent payment is one made after the return is posted. This remittance was made four years before the

return was posted. This coding suggests that it was done only after the return was posted and plaintiff had demanded the return of her deposit. There is no evidence that remittance was coded "670 – subsequent payment" prior to the time that plaintiff demanded its return. In any event, the manner in which the IRS codes remittances is arbitrary and capricious. Remittances are coded 670 when the nature of the remittance is unknown. The code is assigned by an IRS clerk having no knowledge of the relevant facts and circumstances. The code that the IRS assigns to a remittance is irrelevant to its character as a payment or a deposit.

32. *If the IRS had entered the estate's remittance as a deposit in the nature of a cash bond, it would have used the code number 640 with the blocking series 990-999. Interest does not normally accrue on amounts posted with a code 640. (Id. ¶3, App. B at 66-67; see also id Ex. A, App. B at 69.)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact for the reasons stated in plaintiff's objection to defendant's proposed finding number 31, above.

33. *If a taxpayer asks in writing to have a remittance treated as a deposit in the nature of a cash bond, the remittance will be posted with a 640 code. Otherwise, unless an examination is in progress, the agent will post the remittance as an advance payment on deficiency. (Kelly Decl. ¶5, App. B at 67; see also id., Ex. A, App. B at 70 – code 670 ("If return has not posted, credits the Tax Module with prepayment on account").)*

Plaintiff objects to the foregoing proposed finding of uncontroverted fact for the reasons stated in plaintiff's objection to defendant's proposed finding number 31, above.

34. *On May 9, 2000, Mark S. Hamburgh sent Linda Turcotte a letter discussing disposition of the escrow account. He began the letter with the words "I have paid $165,000 out of the escrow to the United States Treasury as a deposit against the federal estate tax." He also*

*Ms. Turcotte that he had paid $350 out of the escrow funds to cover a debt of the estate, and he asked Ms. Turcotte to countersign his letter "to indicate your consent to my applying the remaining $1,704.19 to my invoice for work on the estate and my disbursements." (Stoddart Decl. Ex. 14, App. B at 55).*

Plaintiff agrees with this proposed finding of uncontroverted fact.

35. *On June 30, 2000, Linda Turcotte executed an affidavit as successor trustee of the Philip Goldstein Revocable Trust "for the purpose of inducing MYRNA STONE to consummate her purchase of the [Goldstein property in Florida]." (Stoddart Decl. Ex. 11 at 2, App. B at 46.) In that affidavit, she swore under oath that there were no "federal, state or county tax deficiencies, which could result in a lien or judgment affecting the title to the real or personal property hereinbefore described." (Ibid.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

36. *Also on June 30, 2000, Linda Turcotte executed a quit-claim deed conveying to Myrna Stone the Florida real property of the Philip Goldstein Revocable Trust. (Stoddart Decl. Ex. 12, App. B at 47-48.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

37. *The Estate of Philip Goldstein filed its federal estate-tax form on November 12, 2004. (Stoddart Decl. Ex. 1, App. B at 4.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

38. *Mark S. Hamburgh signed the estate-tax return as preparer (Stoddart Decl. Ex. 17, App. B at 59) and listed himself on the return as the estate's representative before the IRS; he also noted his "CAF number," 2005-08218R (id., App. B at 60).*

Plaintiff agrees with this proposed finding of uncontroverted fact.

39. *Line 23 of the estate-tax return showed a total tax due of $0, and line 27 showed an "overpayment" of $165,000. (Stoddart Decl. Ex. 17, App. B at 59.) Line 24 reads "Prior payments. Explain in an attached statement." The amount listed on line 24 as "prior payments" is $165,000. The return as filed contains a page captioned "Supporting Documents," and that page states, "A Statement of Prior Payments is hereto annexed as Exhibit B." (Id., App. B at 62.) The referenced statement of prior payments reads as follows: (id., App. B at 65):*

*STATEMENT OF PRIOR PAYMENTS*

| *Date* | *Amount of Payment* | *Total of Payments* |
|---|---|---|
| *5/5/2000* | *$165000* | *$165000* |

Plaintiff agrees with this proposed finding of uncontroverted fact.

40. *On April 29, 2005, the IRS sent the estate, through Mark S. Hamburgh, an Estate Tax Closing Document stating that the IRS had determined a net estate tax of $0. (Stoddart Decl. Ex. 15, App. B at 57.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

41. *On August 16, 2005, Mark S, Hamburgh faxed a message to the IRS that stated, in part (Stoddart Decl. Ex. 16, App, B at 58):*

> *The estate received a closing letter, determining the tax to be $0, as set forth on the return.*
>
> *Upon inquiring by telephone today as to the status of the refund of the overpayment shown on the return, I was informed that it had been disallowed. If this is the case, I would appreciate receiving a written notice to said effect and a specific explanation of the reason(s) therefor. Thank you.*

Plaintiff agrees with this proposed finding of uncontroverted fact.

42. *On August 29, 2005, the IRS sent a certified letter to the estate, through Mark S. Hamburgh, stating that it could not allow the claimed overpayment because the estate-tax return was postmarked more than three years after the return date plus any extensions. (Compl. Ex. C.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

43. *Joan Huskins is the current personal representative of the Goldstein estate. She replaced her sister, Linda Turcotte, who represented the estate when it made its remittance to the IRS and who is now deceased. Ms. Huskins has little or no personal knowledge about the remittance. (Stoddart Decl. Ex. 2 at 3, App. B at 12.)*

Plaintiff agrees with this proposed finding of uncontroverted fact.

Respectfully submitted,

**RUDEN, McCLOSKY, SMITH**
**SCHUSTER & RUSSELL, P.A.**
Attorneys for Plaintiff
200 East Broward Boulevard, 15th floor (33301)
Post Office Box 1900
Fort Lauderdale, Florida 33302

By: ______________________
Glen A. Stankee, Esquire
Direct Telephone: (954)761-2907
Direct Facsimile: (954) 333-4107