IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1273 T
(Judge Susan G. Braden)

JOAN HUSKINS, as personal representative of the
ESTATE OF PHILIP GOLDSTEIN,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

The defendant, the United States, offers the following responses to the document the plaintiff captioned "Proposed Findings of Uncontroverted Facts" and served on October 16, 2006. As RCFC 56(h)(2) requires, the defendant has copied each numbered paragraph of the plaintiff's proposed findings and has added its own response:

1. Philip Goldstein died on September 22, 1998, a resident of Florida. A copy of the Certificate of Death, issued by the New York State Department of Health is attached hereto [to the plaintiff's proposed findings] as Exhibit "A".

RESPONSE: The defendant agrees with the proposed finding as stated.

2. The beneficiaries of the decedent's estate (the "Estate") were his daughters, Linda Turcotte and Joan Huskins. A copy of the Philip Goldstein Revocable Trust dated August 21, 1998, is attached hereto as Exhibit "B". A copy of the Last Will and Testament of Philip Goldstein, dated July 24, 1998, is attached hereto as Exhibit "C".

RESPONSE: The defendant agrees with the last two sentences of the proposed finding as stated. The defendant does not agree with the first sentence, which it would rephrase as follows:

> The sole beneficiary of the decedent's estate was the Philip Goldstein Revocable Trust. (See Exhibit C, Article VI.) The beneficiaries of the Philip Goldstein Revocable Trust (as amended on August 21, 1998) were: Philip Goldstein, during his life (Exhibit B at 4-5); and after his death, the six persons listed on page 13 of Exhibit B, who were to receive specific bequests. Linda Turcotte and Joan Huskins were among those legatees. In addition, Linda Turcotte and Joan Huskins were each to receive one half of the residue. (*See id*. at 13-14.)

3. Richard Goldstone, Esq. of Ft. Lauderdale, Florida, was the attorney for the administration of the Estate in Florida. (Aff. ¶5).

RESPONSE: The defendant agrees with the proposed finding as stated, but notes that the finding should have referenced paragraph 4 of the Affidavit of Mark S. Hamburgh (attached to plaintiff's motion for summary judgment)–not paragraph 5.

4. Linda Turcotte was appointed the initial personal representative of the Estate. A copy of the Letters of Administration issued by Judge Mel Grossman, Broward County (Florida) Circuit Court on December 16, 1999, are attached hereto as Exhibit "D".

RESPONSE: The defendant agrees with the proposed finding as stated.

5. Linda Turcotte died during the administration of the Estate, and Joan Huskins was appointed as her successor. A copy of the Successor Letters of Administration issued by Judge Mel Grossman, Broward County (Florida) Circuit Court on August 11, 2004, are attached hereto as Exhibit "E".

RESPONSE: The defendant agrees with the proposed finding as stated.

6. Mark S. Hamburgh was engaged in March of 2000 to prepare the federal and state estate tax returns on behalf of the Estate. (Aff. ¶5).

RESPONSE: The defendant agrees with the proposed finding as stated.

7. Among the assets owned by the Estate at the time of decedent's death were a condominium in Westhampton Beach, New York ("Condominium"), and a mortgage note and mortgage on property located at 311-319 Audubon Avenue, New York, N.Y. (the mortgage note and mortgage are collectively referred to as the "Mortgage"). A copy of the Estate Inventory, as filed with the Probate Division, Broward County (Florida) Circuit Court, dated May 30, 2003, is attached hereto as Exhibit "F". (Aff. ¶6).

RESPONSE: The defendant agrees that the Condominium was among the assets of the Estate, but the referenced Estate Inventory mentions no mortgage or mortgage note. Instead it mentions a fractional interest in a mortgage-foreclosure action. The referenced paragraph 6 of the Affidavit of Mark S. Hamburgh (attached to the estate's motion for summary judgment) states that the mortgage note is the affidavit's Exhibit A. That exhibit identifies Filgo Bert Realties, Inc., as the mortgagee–not Philip Goldstein; and it identifies the mortgaged property as "313-19 Audubon Avenue"–not 311-319 Audubon Avenue. For these reasons, the defendant restates the finding as follows:

> Among the assets owned by the Estate at the time of decedent's death was a condominium in Westhampton Beach, New York ("Condominium"). The Estate also had an indirect interest in a mortgage note and mortgage on property located at 313-319 Audubon Avenue, New York, N.Y. (the mortgage note and mortgage are collectively referred to as the "Mortgage"). A copy of the Estate Inventory, as filed with the Probate Division, Broward County (Florida) Circuit Court, dated May 30, 2003, is attached hereto as Exhibit "F". (Aff. ¶6).

8. On February 19, 2000, Linda Turcotte, as personal representative of the Estate, entered into a contract to sell the Condominium for $180,000. Attorney William F. Bates represented the Estate in the sale. (Aff. ¶ 7).

RESPONSE: The defendant agrees with the proposed finding as stated.

9. In connection with the sale, the purchaser's title insurance company, Aquebog Abstract Corp. ("Title Insurance Company"), raised an exception to coverage based on the absence of proof of payment of New York and federal estate taxes. (Aff. ¶ 8).

RESPONSE: The defendant agrees with the proposed finding as stated.

10. Such an exception to title insurance coverage was not acceptable to the purchaser. In order to eliminate the exception for estate taxes from the title insurance policy, Mr. Hamburgh negotiated an agreement between the Estate and the Title Insurance Company. Pursuant to the agreement, the Title Insurance Company would omit the exception provided that the sales proceeds, or, if less, the Estate's estate tax liabilities based on a "worst case scenario", were deposited into escrow for payment of any estate taxes that might be owed. Mr. Hamburgh served as escrow agent under the escrow agreement. Until the Estate's estate tax liabilities were determined and discharged, the funds could not be applied for any purpose other than federal or state estate taxes. (Aff. ¶ 9).

RESPONSE: The defendant agrees with the proposed finding as stated.

11. The Estate was engaged in foreclosure litigation with respect to the Mortgage which commenced prior to the death of decedent. (Aff. ¶ 10).

RESPONSE: The defendant agrees with the proposed finding as stated.

12. The estate's interest in the Mortgage was very difficult to value. While the principal value of the Mortgage was approximately $175,000, it contained a provision for late fees, the validity and enforceability of which was uncertain. With the late fees, the amount owed under the Mortgage was approximately $2,000,000. However, the Mortgage was non-recourse and therefore its value could not exceed the value of the property which secured it, but the property had not been appraised. To complicate matters further, the decedent's brother, Bertram Goldstein, claimed to own 50% of the Mortgage. (Aff. ¶ 11).

RESPONSE: This proposed finding combines facts with subjective impressions and conclusions, which should not have been included. *See* RCFC 56(h)(1) (requiring a statement of "material facts"). The defendant therefore restates the proposed finding as follows, marking the impressions and conclusions with the phrase "Mr. Hamburgh believed"–

> Mr Hamburgh believed that the estate's interest in the Mortgage was very difficult to value. While the principal value of the Mortgage was approximately $175,000, it contained a provision for late fees; Mr. Hamburgh believed that the validity and enforceability of this provision was uncertain. With late fees, the amount owed under the Mortgage was approximately $2,000,000. However, the Mortgage was non-recourse and therefore its value could not exceed the value of the property which secured it, but the property had not been appraised. The decedent's brother, Bertram Goldstein, claimed to own 50% of the Mortgage. Mr. Hamburgh believed that this complicated matters further. (Aff. ¶ 11).

13. Because of the ongoing litigation, the uncertainty of the outcome and the difficulty of valuing the Mortgage, Mr. Hamburgh was unable to prepare the federal and state estate tax returns as and when they were due. (Aff. ¶ 12).

RESPONSE: This proposed finding rests on the assumption that an estate's representative cannot file an estate-tax form reporting the estimated value of assets that are subject to litigation or other contingencies. The assumption is incorrect. *See, e.g.,* Treas. Reg.

§ 20.6081-1(d) (emphasis added) ("A return *as complete as possible* must be filed before the expiration of the extension period. . . . The return cannot be amended after the expiration of the extension period *although supplemental information may subsequently be filed that may result in a finally determined tax different from the amount shown as the tax on the return*"). For this reason, the defendant restates the proposed finding as follows:

> Because of the ongoing litigation, the uncertainty of the outcome and the difficulty of valuing the Mortgage, Mr. Hamburgh was unable to file a final and completely accurate version of the federal and state estate tax returns as and when the returns were due. (Aff. ¶ 12).

14. The Title Insurance Company asked Mr. Hamburgh and Mr. Goldstone to determine the Estate's tax liabilities under a "worst case scenario". To do so, they obtained a real estate broker's opinion of the value of the mortgaged property on April 10, 2000, from Amit Doshi, of Besen & Associates, Inc. Mr. Doshi determined that the value of the property, and therefore the value of the Mortgage, was $580,000. (Aff. ¶ 13).

RESPONSE: The defendant agrees with the proposed finding as stated.

15. Using Mr. Doshi's opinion of the value of the Mortgage, on April 10, 2000, Mr. Hamburgh computed the Estate's federal estate tax liability under the "worst case scenario" to be $178,474. With interest and penalties already accrued on that amount of tax, the total liability would have been $245,791. Mr. Hamburgh's computations did not take into account the claim asserted by the decedent's brother or any deductions to which the Estate may have been entitled. (Aff. ¶ 14).

RESPONSE: The defendant agrees with the proposed finding as far as it goes, but the proposed finding is incomplete and misleading. The finding suggests that Mr. Hamburgh

produced only one computation of the Estate's tax liability–a "worst-case-scenario" computation that "did not take into account the claim asserted by the decedent's brother or any deductions to which the Estate may have been entitled."

In fact, Mr. Hamburgh produced two more valuations that did take into account the claim asserted by the decedent's brother and that did at least estimate the deductions to which the Estate might be entitled. He produced those computations on April 14, 2000–just four days after the computation he chose to disclose in his affidavit and three days before the closing on the Condominium. (*See* the Estate's proposed finding 16, *infra*.) In the first of his later computations he assumed that the value of the Mortgage was $460,000 rather than the $580,000 suggested by Mr. Doshi; the result of that computation was a tax liability of $184,905. *See* Appendix B to Brief in Support of Defendant's Motion for Summary Judgment (hereinafter Def. App. B), Stoddart Decl. Ex. 7, page 31. In his second later computation he assumed a hypothetical estate of $1,000,000, which was $194,000 less than the estimated value of the gross estate; the computation resulted in a tax liability of $145,374 (tax plus penalties). *See id*. at 33. The average of the two later computations, rounded to the nearest thousand, is $165,000. ($185,000 + 145,000 = $330,000 / 2 = $165,000) Mr. Hamburgh's affidavit fails to mention these two later computations.

For the reasons given, the defendant restates the proposed finding as follows:

> Using Mr. Doshi's opinion of the value of the Mortgage, on April 10, 2000, Mr. Hamburgh computed the Estate's federal estate tax liability under the "worst case scenario" to be $178,474. With interest and penalties already accrued on that amount of tax, the total liability would have been $245,791. Mr. Hamburgh's computation did not take into account the claim asserted by the decedent's brother or any deductions to which the Estate may have been entitled. (Aff. ¶ 14). Four days later, Mr. Hamburgh computed the Estate's federal estate

tax liability by (1) reducing Mr. Doshi's estimate of the Mortgage's value; and (2) reducing the gross estate by $194,000. Those later computations resulted in estate tax liabilities (including penalties) of $184,905 and $145,374 respectively.

16. Closing on the sale of the Condominium occurred on April 17, 2000. The net sales proceeds to the Estate upon the sale of the Condominium totaled just $168,480. The Title Insurance Company agreed to omit the exception for unpaid estate taxes provided that $165,000 of the sales proceeds were deposited into the escrow and the beneficiaries executed undertakings to personally pay any additional estate taxes that may be due. It agreed that the excess proceeds ($3,480) could be used to reimburse Ms. Turcotte for expenses she had incurred and paid on behalf of the Estate. (Aff. ¶ 15.)

RESPONSE: The defendant agrees with the first sentence as stated, but the remainder of the proposed finding conflicts with the record. First, there is evidence that the sale proceeds were $167,054.19: after Mr. Hamburgh sent $165,000 of the proceeds to the IRS, the remaining balance was $2,054.19. *See* Def. App. B at 55; *see also id*. at 44 (Letter of Linda Turcotte to Mark Hamburgh (May 5, 2000): "you are presently holding approximately $167,000.00 as proceeds of sale from the closing of the estate's real property"). Second, the proposed finding suggests that only "$165,000 of the sales proceeds were deposited into the escrow," and it suggests that the Title Insurance Company released its claim on the rest of the sales proceeds because the beneficiaries executed undertakings to pay any additional tax liability. The record casts doubt on those suggestions.

The parties executed the escrow agreement on April 10, 2000 (Def. App. at 34); the agreement was in effect at the time of the closing. It required Mr. Hamburgh to "hold *the Proceeds* [not just $165,000 of the proceeds] in escrow and disburse same pursuant to this

Agreement" (*id*. at 36; emphasis added). Aquebogue promised to "omit the Exception" in exchange for establishment of the escrow–not in exchange for Ms. Turcotte's promise to pay any additional tax. *Ibid*. And most importantly, Mr. Hamburgh could release funds from the escrow to the Estate only if "proof of full payment of the Federal Estate Tax [and New York estate tax], reasonably satisfactory to Aquebogue, is exhibited to Aquebogue." Before those preconditions were met, however, the agreement provided that "Escrowee shall not release any part of the Escrow to the Estate or for any other purpose to the benefit of the Estate." *Id*. at 37.

Mr. Hamburgh sent $165,000 to the IRS on May 5, 2000. *See* the Estate's proposed finding number 17, *infra*. On May 9, 2000, Mr. Hamburgh informed Ms. Turcotte that he had used $350 of the sales proceeds to pay a bill, and he requested her consent to apply the remaining $1,704.19 to his expenses. *See* Def. App. B at 55.

If Aquebogue agreed both to omit the exception and to release part of the sales proceeds to the Estate, then at some time between April 10 and May 9, 2000, Aquebogue either waived its rights under the escrow agreement and accepted different terms (as Mr. Hamburgh's affidavit suggests)–or it received proof, reasonably satisfactory to itself, that the Estate had paid its tax liability. Aquebogue could have found reasonable satisfaction in the $165,000 remittance, plus Mr. Hamburgh's April 14 computations of the estate tax liability (the average of which is $165,000), plus Ms. Turcotte's promise to pay any additional tax. She made that promise on April 11, 2000. *See* Def. App. B at 43.

Mr. Hamburgh's affidavit conflicts with the provisions of the escrow agreement, and the conflict creates a genuine issue of fact that the Court cannot resolve on cross-motions for

summary judgment. (The question is not a question of *material* fact.) For this reason the defendant rephrases the proposed finding as follows:

> Closing on the sale of the Condominium occurred on April 17, 2000. The net sales proceeds to the Estate upon the sale of the Condominium totaled something in excess of $165,000. The Title Insurance Company eventually agreed that the proceeds in excess of $165,000 could be used to reimburse Ms. Turcotte for expenses she had incurred and paid on behalf of the Estate.

17. Mr. Goldstone and Mr. Hamburgh were concerned about the accrual of interest and penalties on any tax liability that the Estate may owe. They recommended to Ms. Turcotte that the escrowed funds be deposited with the IRS to stop the accrual of interest and penalties on that amount of estate tax. By letter dated May 5, 2000, Ms. Turcotte authorized Mr. Hamburgh to do so. Mr. Hamburgh hand delivered a check to the IRS on the same day. (Aff. ¶ 16).

RESPONSE: The first sentence of the proposed finding makes an assertion that is unsupported: Mr. Hamburgh has demonstrated no personal knowledge of Mr. Goldstone's "concerns," as required by RCFC 56(e), and has failed to show how he came to know of those concerns. The assertion must be ignored.

The second sentence asserts a legal characterization rather than a fact. Mr. Hamburgh says that he and Mr. Goldstone recommended a "deposit" to stop the accrual of interest and penalties on "that amount of estate tax"–*i.e.*, on the amount of the "deposit." Mr. Hamburgh avoids stating under penalty of perjury that he used the word "deposit" in his recommendation to Ms. Turcotte; and his general description–using a loaded technical term more than six years later–cannot support a factual finding that he either made a deposit or even said the word "deposit." *See VanCanagan v. United States*, 231 F.3d 1349, 1353-54 (Fed. Cir. 2000) (accountant submitted conclusory affidavit that a remittance made five and a half years earlier

was a "deposit" made to prevent accrual of penalties and interest, but his statement raised no factual issue that could prevent grant of summary judgment to the Government).

The third sentence contradicts the record. Ms. Turcotte did not authorize Mr. Hamburgh to make a "deposit[] . . . to stop the accrual of interest and penalties on that amount of estate tax." Those words appear nowhere in her letter and cannot be inferred from her letter. In fact, Ms. Turcotte gave Mr. Hamburgh the following instructions (Def. App. B at 44, emphasis added):

> Please consider this as my authorization and letter of instructions to *pay* pending estate taxes for the Estate of Philip Goldstein.
>
> I am aware that you are presently holding approximately $167,000.00 as proceeds of sale from the closing of the estate's real property in Westhampton Beach, New York. The sum of $165,000.00 should be applied to *pay* Federal Estate Taxes and/or New York Estate Taxes as soon as possible. Please discuss and determine the *payment/s* to Internal Revenue Service and the State of New York and the amount or amounts thereof, between yourself and my Florida attorney, Richard Goldstone. Your mutual decision who to *pay* and how much to *pay* will be acceptable to me.

The defendant agrees with the fourth sentence of the proposed finding as far as it goes, but the sentence is incomplete and even misleading in light of the preceding sentences. Mr. Hamburgh hand-delivered the check along with a cover letter that instructed the IRS how to treat the check. The letter stated (Compl. Ex. A, emphasis added): "This *payment* is to be applied to the estate tax on the above-named decedent."

For these reasons, the defendant rephrases the proposed finding as follows:

> Mr. Hamburgh was concerned about the accrual of interest and penalties on any tax liability that the Estate might owe. He recommended to Ms. Turcotte that the escrowed funds be remitted to the IRS to stop the accrual of interest and penalties on that amount of estate tax. By letter dated May 5, 2000, Ms. Turcotte authorized him to compute the payment and to pay the tax. Mr. Hamburgh hand delivered a check to the IRS on the same day with a letter stating, "This payment is to be applied to the estate tax on the above-named decedent."

18. At the time the $165,000 remittance was made on May 5, 2000, the amount of estate tax, if any, had not been determined and could not be determined. The remittance represented substantially all of the net proceeds of the sale of the Condominium and bore no relationship to any tax liability that was deemed owed by the Estate. It was made to stop the accrual of interest and penalties on whatever federal estate taxes might have been owed. It was not made to satisfy any estate tax liability that had been determined by the IRS. The IRS had never proposed any amount of estate tax liability that the Estate owed. (Aff. ¶ 17).

RESPONSE: This proposed finding asserts legal conclusions that the Estate would like this Court to reach–but it asserts few facts supported by the record.

The defendant disagrees with the assertions in the first sentence for this reason: Although the Estate could not have calculated its final tax liability when it remitted the $165,000, it had made several good-faith calculations of its liability from information available at the time, based upon reasonable assumptions. *See* Def. App. B at 31-33. The defendant disagrees with the assertions in the second sentence because the amount of the remittance, $165,000, bore a striking relationship to the Estate's good-faith estimates of its tax liability; in fact, the remittance was the average of the two estimates. The defendant does not disagree with the assertions in the third sentence, but the assertions are ambiguous because both payments and deposits stop the accrual of interest and penalties. *See* Rev. Proc. 84-58, § 5.01, set out at page 57 of Brief in Support of Defendant's Motion for Summary Judgment (Def. Mot.). Similarly, the defendant does not disagree with the assertions in the fourth and fifth sentences, but the assertions are irrelevant and misleading: they imply (falsely) that a taxpayer cannot "pay" a liability that the IRS has not determined or assessed. *See* Def. Mot. at 15-17 and 25-28.

For these reasons, the defendant rephrases the proposed finding as follows:

> At the time the $165,000 remittance was made on May 5, 2000, the amount of estate tax, if any, had not been determined with finality. The remittance represented substantially all of the net proceeds of the sale of the Condominium. The amount of the remittance was in the mid-point of the possible estate-tax liabilities that the Estate had estimated on April 14, 2000. The remittance was made to stop the accrual of interest and penalties on whatever federal estate taxes might have been finally determined. It was not made to satisfy any estate-tax liability that had been determined by the IRS. The IRS had never proposed any amount of estate-tax liability that the Estate owed. Only the Estate had made estimates of its estate-tax liability.

19. The litigation with the decedent's brother, Bertram Goldstein, was resolved in December of 2000. Ultimately, the foreclosure litigation involving the Mortgage was settled for $340,144. The Estate's interest in the Mortgage could be correctly valued for estate tax purposes at $170,072 (as contrasted with the $580,000 value that was used in computing the estate tax liability under the "worse [*sic*] case scenario"). (Aff. ¶ 18).

RESPONSE: The defendant agrees with the first sentence of the proposed finding as stated. The second sentence, however, is vague and omits a fact of interest: the foreclosure litigation was "ultimately" settled on *February 7, 2002*. *See* Affidavit of Mark S. Hamburgh, ¶ 18 and Ex. L at 8. The judge approved the settlement on March 5, 2002. *Id*., Ex. L at 9. The Estate could have recovered its $165,000 remittance, plus interest, by filing a claim as late as May 5, 2003–three years after the payment date. *See* 26 U.S.C. § 6511(b)(2)(A). The Estate, however, did not file its estate-tax return until November 12, 2004–more than two years and eight months after the Mortgage litigation was settled and "[t]he Estate's interest in the Mortgage could be correctly valued for estate tax purposes at $170,072." This fact casts doubt on the Estate's excuse for filing an untimely refund claim.

The third sentence is incomplete and misleading: it implies that the Estate could not have valued the Mortgage "for estate tax purposes" before the litigation ended. The implication is false. The law required the Estate to file the return within nine months of the decedent's death (26 U.S.C.§ 6018(a)(1)) or within an extension of time that the Estate could have requested, but failed to request. The Estate should have estimated the value of the Mortgage and should have filed "a return [that was] as complete as possible" within the time allowed by law; it could have filed supplemental information later. *See* Treas. Reg. § 20.6081-1(d). Furthermore, the third sentence of the proposed finding fails to note that the estate in fact did assign a lower value to the Mortgage ($460,000) when it computed its estate-tax liability on April 14, 2000. *See* Def. App. B at 31.

For this reason, the defendant rephrases the proposed finding as follows:

> The litigation with the decedent's brother, Bertram Goldstein, was resolved in December of 2000. On February 7, 2002, the foreclosure litigation involving the Mortgage was settled for $340,144; the judge approved the settlement on March 5, 2002. The Estate's interest in the Mortgage could then be given its final and conclusive value of $170,072 (as contrasted with the $580,000 value that was used in computing the estate tax liability under the "worst case scenario" and the $460,000 value used in the Estate's tax computation of April 14, 2000).

20. The federal estate tax return was filed on November 2, 2004. With the $138,380 in deductions that were disregarded in computing the estate tax liability under the "worst case scenario", the taxable estate for federal estate tax purposes totaled just $636,126, and the tentative tax on that amount totaled $206,167. After the unified credit of $202,050 and a state death tax credit of $4,117 were applied, the Estate had no federal estate tax liability. The federal

estate tax return disclosed the $165,000 remittance and the Estate's entitlement to its return. (Aff. ¶ 19).

RESPONSE: The first sentence of the proposed finding is incorrect: the federal estate-tax return was filed on November 12, 2004. *See* Def. App. B at 4, 9; Plaintiff's Proposed Findings, Ex. G. The second sentence is incomplete and misleading: it notes, correctly, that the Estate ignored the $138,380 of deductions in its "worst case scenario" computation; but it fails to disclose that the Estate made two other computations, and in one of those computations it effectively subtracted deductions of $194,000 from what it had estimated to be the gross estate ($1,194,000). *See* Def. App. B at 33. The defendant agrees with the third sentence as stated. The fourth sentence, however, misstates the facts: On line 24 of its return the Estate reported 165,000 as "Prior payments" (Def. App. B at 59); on line 27, the Estate reported -165,000 as "overpayment" (*ibid*.); and on a schedule captioned "Statement of Prior Payments," the Estate reported $165,000 as "Amount of Payment" and as "Total of Payments." To confirm the impression given by the return that the Estate had made a payment, Mr. Hamburgh later telephoned the IRS to inquire about "the status of the overpayment shown on the return." Def. App. B at 58.

For the reasons given, the defendant rephrases the proposed finding as follows:

> The federal estate tax return was filed on November 12, 2004. With the $138,380 in deductions that were disregarded in computing the estate tax liability under the "worst case scenario", the taxable estate for federal estate tax purposes totaled just $636,126, and the tentative tax on that amount totaled $206,167. (The Estate, however, made other computations in addition to the "worst case scenario" computation; in those computations, it reduced the gross estate by various amounts.) After the unified credit of $202,050 and a state death tax credit of $4,117 were applied, the Estate had no federal estate tax liability. The federal

estate tax return disclosed "prior payments" of $165,000 and reported an "overpayment" of $165,000.

21. On April 29, 2005, the IRS issued an Estate Tax Closing Document reflecting that the Estate had no federal estate tax liability. (Aff. ¶ 20).

RESPONSE: The defendant agrees with the proposed finding as stated.

22. On August 29, 2005, the IRS advised Mr. Hamburgh that it regarded the $165,000 remittance as a payment and the demand for its return as a claim for refund which it disallowed on the grounds that it was barred be [*sic*] the statute of limitations because the estate tax return was postmarked more than three years after the return due date. (Aff. ¶ 22).

RESPONSE: The proposed finding misstates what the IRS told Mr. Hamburgh. It gives the impression that the IRS imposed the label "payment" upon the remittance and arbitrarily decided to "regard" the demand for its return as a claim for refund. In fact, the IRS was responding to Mr. Hamburgh's wishes, which he had expressed both orally and in writing. On August 16, 2005, nearly two weeks before the IRS sent the letter mentioned in the proposed finding, Mr. Hamburgh inquired about what he called "the status of the *refund* of the over*payment shown on the return*." Def. App. B at 58 (emphasis added). In its letter of August 29, 2005, the IRS simply said: "We couldn't allow your claim." Compl. Ex. C. The word "payment" appears on none of the letter's four pages. *See id.* To say the least, the IRS never "advised Mr. Hamburgh that it regarded the $165,000 remittance as a payment." It was Mr. Hamburgh who had called the remittance a payment and who had demanded its refund as an overpayment.

For these reasons, the defendant rephrases the proposed finding as follows:

> On August 29, 2005, the IRS advised Mr. Hamburgh that it could not allow his claim because the estate tax return was postmarked more than three years after the return due date.

23. The IRS coded the remittance as a "670 – subsequent payment". The offsetting debit which zeroed out the Estate's account was coded "820 – credit transferred". No amount of federal estate tax was ever assessed. A copy of the transcript of the account is attached as Exhibit "G".

RESPONSE: The defendant agrees with the proposed finding as stated.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
U.S. Justice Department, Tax Division
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

s/ David Gustafson

November 16, 2006