indicated in paragraph 3 of his affidavit dated April 10, 2000, (Exhibit "E", Hamburgh's Affidavit) his computations were solely for the limited purpose of determining that exposure. He made it clear that the actual tax liability was subject to various unresolved factors and that the estate was not committed to these figures in any way.

Mr. Hamburgh computed the tax liability based on the assumptions that (i) the estate included the decedent's brother's share of the mortgage, (ii) the value of the mortgage was the value of the mortgaged property; (iii) the broker's $580,000 valuation of the mortgaged property was sustained, and (iv) none of the expenses incurred by the estate were deducted. The computation assumed that each issue involved in the ongoing litigation was resolved 100% in favor of the estate. Mr. Hamburgh was representing the estate in the litigation involving the decedent's brother's interest in the mortgage and the value of the mortgage and mortgaged property. He knew that it was unlikely that each of those issues would be resolved 100% in favor of the estate. Mr. Hamburgh knew that the estate was entitled to deductions which his computations did not take into account. The computations revealed a worst case exposure to federal estate tax liabilities, including penalties and interest, of $245,791. This figure, of course, bore no relationship to what Mr. Hamburgh believed to be the estate's federal and state estate tax liability and it bore no relationship to the $165,000 remittance. (Aff. ¶ 14).

Plaintiff's proposed finding of fact should be adopted as originally proposed.

16. Closing on the sale of the Condominium occurred on April 17, 2000. The net sales proceeds to the Estate upon the sale of the Condominium totaled just $168,480. The Title Insurance Company agreed to omit the exception for unpaid estate taxes provided that $165,000 of the sales proceeds were deposited into the escrow and the beneficiaries executed undertakings to personally pay any additional estate taxes that may be due. It agreed that the excess proceeds

FTL:1992646:2

($3,480) could be used to reimburse Ms. Turcotte for expenses she had incurred and paid on behalf of the Estate. (Aff. ¶ 15).

Defendant's Response: The defendant agrees with the first sentence as stated, but the remainder of the proposed finding conflicts with the record. First, there is evidence that the sale proceeds were $167,054.19; after Mr. Hamburgh sent $165,000 of the proceeds to the IRS, the remaining balance of $2,054.19. *See* Def. App. B at 55; *see also id.* at 44 (Letter of Linda Turcotte to Mark Hamburgh (May 5, 2000): "you are presently holding approximately $167,000.00 as proceeds of sale from the closing of the estate's real property"). Second, the proposed finding suggests that only $165,000 of the sales proceeds were deposited into the escrow," and it suggests that the Title Insurance Company released its claim on the rest of the sales proceeds because the beneficiaries executed undertakings to pay any additional tax liability. The record casts doubt on those suggestions.

The parties executed the escrow agreement on April 10, 2000 (Def. App. at 34); the agreement was in effect at the time of the closing. It required Mr. Hamburgh to "hold *the Proceeds* [not just $165,000 of the proceeds] in escrow and disburse same pursuant to this Agreement" (*id.* at 36; emphasis added). Aquebogue promised to "omit the Exception" in exchange for establishment of the escrow – not in exchange for Ms. Turcotte's promise to pay any additional tax. *Ibid.* And most importantly, Mr. Hamburgh could release funds from the escrow to the Estate only if "proof of full payment of the Federal Estate Tax [and New York estate tax], reasonably satisfactory to Aquebogue, is exhibited to Aquebogue." Before those preconditions were met, however, the agreement provided that "Escrowee shall not release any part of the Escrow to the Estate or for any other purpose to the benefit of the Estate." *Id.* at 37.

FTL:1992646:2

Mr. Hamburgh sent $165,000 to the IRS on May 5, 2000. *See* the Estate's proposed finding number 17, *infra*. On May 9, 2000, Mr. Hamburgh informed Ms. Turcotte that he had used $350 of the sales proceeds to pay a bill, and he requested her consent to apply the remaining $1,709.19 to his expenses. *See* Def. App. B at 55.

If Aquebogue agreed both to omit the exception and to release part of the sales proceeds to the Estate, then at some time between April 10 and May 9, 2000, Aquebogue either waived its rights under the escrow agreement and accepted different terms (as Mr. Hamburgh's affidavit suggests) - or it received proof, reasonably satisfactory to itself, that the Estate had paid its tax liability. Aquebogue could have found reasonable satisfaction in the $165,000 remittance, plus Mr. Hamburgh's April 14 computations of the estate tax liability (the average of which is $165,000), plus Ms. Turcotte's promise to pay any additional tax. She made that promise on April 11, 2000. *See* Def. App. B at 43.

Mr. Hamburgh's affidavit conflicts with the provisions of the escrow agreement, and the conflict creates a genuine issue of fact that the Court cannot resolve on cross-motions for summary judgment. (The question is not a question of *material* fact.) For this reason the defendant rephrases the proposed findings as follows:

> Closing on the sale of the Condominium occurred on April 17, 2000. The net sales proceeds to the Estate upon the sale of the Condominium totaled something in excess of $165,000. The Title Insurance Company eventually agreed that the proceeds in excess of $165,000 could be used to reimburse Ms. Turcotte for expenses she had incurred and paid on behalf of the Estate.

**Plaintiff's Reply to Defendant's Response:** Plaintiff disagrees with defendant's response and proposed restatement thereof because they are inaccurate. While defendant correctly calculates the amount of the sale proceeds received by Mr. Hamburgh, he misstates the amount to be held by Mr. Hamburgh in escrow pursuant to the Escrow Agreement. Pursuant to a letter to Mr. Hamburgh from William F. Bates, Esquire, dated April 17, 2000, the total of the

sale proceeds received by Mr. Hamburgh was in fact $167,054.19, (See Exhibit "A" attached hereto). However, the letter goes on to further state that:

> The check to your order in the amount of $1,300 represents the amounts prepaid by Linda Turcotte for expenses from her Trust. I have checked with Ken Zahler of the Title Company and this amount may be released to Linda, as you will still receive over $165,000 to hold in escrow against the Federal and State Estate Taxes.

Accordingly, of the $167,054.19 delivered to Mr. Hamburgh as escrowee, the amount to be held pursuant to the Escrow Agreement was $165,754.19, not $167,054.19 as alleged by the defendant.

Further, defendant argues that the escrow agreement required Mr. Hamburgh to "hold *the proceeds* [not just $165,000 of the proceeds] in escrow and disburse same pursuant to this Agreement (*id.* at 36; emphasis added).

Paragraph (l), at page 2, of the escrow agreement (Ex. D to the Affidavit of Mark S. Hamburgh) states as follows:

> (l) It is estimated that the net proceeds of the Sale (the "Proceeds") will be in the approximate amount of $165,000 and that Bates will cause the check(s) in payment of the Proceeds (the "Check") to be delivered to Hamburgh promptly after the closing on the Sale

Further, the escrow agreement provides, at paragraph 6., page 3, that:

> 6. Escrowee may at any time and from time to time, apply all or part of the Escrow to the payment of the federal estate tax and/or penalties and interest thereon (collectively, the "Federal Estate Tax") and/or New York State estate tax and/or penalties and interest thereon (collectively, the "New York Estate Tax). This includes the payment of any amount that may ultimately be determined to have been an overpayment.

Of the amount held in Escrow, Mr. Hamburgh remitted $165,000 to the IRS, leaving a balance of only $754.19 of the escrowed funds, the amount in excess of the $754.19, being $1,300, was not subject to the Escrow Agreement.

Mr. Hamburgh's affidavit does not conflict with the provisions of the Escrow Agreement. Further, there is there is no genuine issue of fact as stated by defendant in that there is no conflict between the plaintiff's proposed finding and Mr. Hamburgh's affidavit, as supported by the Escrow Agreement and Mr. Bates letter, attached hereto as Exhibit "A". Accordingly, plaintiff's proposed finding of fact should be adopted as originally proposed.

17. Mr. Goldstone and Mr. Hamburgh were concerned about the accrual of interest and penalties on any tax liability that the Estate may owe. They recommended to Ms. Turcotte that the escrowed funds be deposited with the IRS to stop the accrual of interest and penalties on that amount of estate tax. By letter dated May 5, 2000, Ms. Turcotte authorized Mr. Hamburgh to do so. Mr. Hamburgh hand delivered a check to the IRS in New York on the same day. (Aff. ¶ 16).

Defendant's Response: The first sentence of the proposed finding makes an assertion that is unsupported: Mr. Hamburgh has demonstrated no personal knowledge of Mr. Goldstone's "concerns," as required by RCFC 56(e), and has failed to show how he came to know of those concerns. The assertion must be ignored.

The second sentence asserts a legal characterization rather than a fact. Mr. Hamburgh says that he and Mr. Goldstone recommended a "deposit" to stop the accrual of interest and penalties on that "amount of estate tax" – *i.e.*, on the amount of the "deposit". Mr. Hamburgh avoids stating under penalty of perjury that he used the word "deposit" in his recommendation to Ms. Turcotte; and his general description – using a loaded technical term more than six years later-cannot support a factual finding that he either made a deposit or even said the word "deposit." *See VanCanagan v. United States, 231* F.3d 1349, 1353-54 (Fed. Cir. *2000)* (accountant submitted conclusory affidavit that a remittance made five and a