# In the United States Court of Federal Claims

No. 05-1273T
Filed March 16, 2007
**TO BE PUBLISHED**

| | |
|---|---|
| JOAN HUSKINS, as personal representative of the ESTATE OF PHILLIP GOLDSTEIN,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Current Tax Payment Act of 1943, 26 U.S.C. § 6401(c);<br>Interest;<br>Rev. Proc. 84-58, 1984-2 C.B. 501;<br>Summary Judgment, RCFC 56(c);<br>Statute of Limitations, 26 U.S.C. § 6511;<br>Tax Deposit;<br>Tax Payment;<br>Tucker Act, 28 U.S.C. § 1491;<br>26 U.S.C. §§ 6075, 6151(a). |

**Glen A. Stankee**, Ruden, McClosky, Fort Lauderdale, Florida, counsel for plaintiff.

**Robert Charles Stoddart**, United States Department of Justice, Tax Division, Washington, D.C., counsel for defendant.

## MEMORANDUM OPINION AND FINAL JUDGMENT

**BRADEN, Judge.**

The issue in this case is whether an estate's remittance to the Internal Revenue Service ("IRS") was a tax payment or a tax deposit.

## I. RELEVANT FACTS.[1]

[1] The relevant facts recited herein were derived from: the December 9, 2005 Complaint ("Compl."); the defendant ("Government")'s April 10, 2006 Answer; the Government's October 16, 2006 Motion for Summary Judgment ("Gov't Mot."), appendices thereto ("Gov't App. A-B"), and Proposed Findings of Uncontroverted Fact ("Gov't PF"); Plaintiff's October 19, 2006 Cross-Motion for Summary Judgment ("Pl. Mot."), the October 19, 2006 Affidavit of Mark S. Hamburgh ("Hamburgh Aff.") in support and exhibits thereto ("PX A-P"); Plaintiff's October 19, 2006 Proposed Findings of Uncontroverted Fact ("Pl. PF") and exhibits thereto ("Ex. A-G"); Plaintiff's November 16, 2006 Response to the Government's Motion for Summary Judgment ("Pl. Resp."); Plaintiff's November 16, 2006 Response to the Government's Proposed Findings ("Pl. PF Resp."); the Government's November 16, 2006 Response to Plaintiff's Cross Motion for Summary Judgment

Mr. Philip Goldstein ("Decedent") died on September 22, 1998. *See* PX A (Certificate of Death). The sole beneficiary of Decedent's estate ("Estate" or "Plaintiff") was the Philip Goldstein Revocable Trust ("Trust"). *See* Ex. C, Article VI (July 24, 1998 Last Will and Testament of Philip Goldstein). The beneficiaries of the Trust were Philip Goldstein, during his life, and, after his death, six persons designated with specific bequests. *See* Ex. B (Aug. 21, 1998 Philip Goldstein Revocable Trust). Decedent's daughters, Ms. Linda Turcotte and Ms. Joan Huskins, each was designated to receive one half of any residue of the Estate. *Id.* On December 16, 1999, Ms. Linda Turcotte was appointed as the personal representative of the Estate.[2] *See* Ex. D (Dec. 16 1999 Letters of Administration). Since Ms. Turcotte died during the administration of the Estate, Ms. Huskins subsequently was appointed as the personal representative. *See* Ex. E (Aug. 11, 2004 Successor Letters of Administration).

In March 2000, the Estate's assets consisted of: property in Broward County, Florida ("Florida property"); a condominium in Westhampton Beach, New York ("Condominium"); and an indirect interest in a mortgage note and mortgage on property located at 313-319 Audubon Avenue, New York, New York ("Mortgage"). *See* Ex. F (May 29, 2003 Estate Inventory); PX A (Mortgage Note); *see also* Hamburgh Aff. ¶ 6.

The Estate's interest in the Mortgage was difficult to value, because the Mortgage was subject to foreclosure litigation in the Supreme Court of the State of New York. *See* PX G; *see also* PX L; Hamburgh Aff. ¶ 11. Although the principal value of the Mortgage was approximately $249,000, the amount owed, including late fees, was approximately $2,000,000. *See* Hamburgh ¶ 11. It was unclear, however, whether the late fees were enforceable, because, under New York case law, purchase money mortgages arguably were exempt from all usury statutes. *Id.* In addition, the

("Gov't Resp.") and appendix thereto ("Gov't Resp. App."); the Government's November 16, 2006 Response to Plaintiff's Proposed Findings ("Gov't PF Resp."); the Government's November 16, 2006 Proposed Additional Findings ("Gov't AF"); Plaintiff's November 30, 2006 Reply to the Government's Response to Plaintiff's Motion for Summary Judgment ("Pl. Reply") and appendices thereto ("Pl. Reply App. A-B"); Plaintiff's November 30, 2006 Reply to the Government's Response to Plaintiff's Proposed Findings ("Pl. PF Reply") and exhibit thereto ("Pl. PF Reply Ex. A"); Plaintiff's November 30, 2006 Response to the Government's Proposed Additional Findings ("Pl. AF Resp."); the Government's December 4, 2006 Reply to Plaintiff's Response to the Government's Motion for Summary Judgment ("Gov't Reply") and appendix thereto ("Gov't Reply App."); and the February 12, 2007 oral argument ("TR 1-67").

[2] Under the laws of the State of Florida, a personal representative is a "fiduciary appointed by the court to administer the estate and refers to what has been known as an administrator, administrator cum testamento annexo, administrator de bonis non, ancillary administrator, ancillary executor, or executor." *See* FLA. STAT. § 731.201 (25) (2006).

Mortgage was non-recourse,[3] and therefore could not exceed the value of the property that secured it. *Id.* Moreover, Decedent's brother, Mr. Bertram Goldstein, also claimed a 50% interest in the Mortgage. *See* PX G. Because of the ongoing litigation and difficulty in valuing the Mortgage, the Estate was unable to file final federal and state estate tax returns on June 22, 1999, the due date. *See* Hamburgh Aff. ¶ 12. The Estate, however, never requested an extension to file. *See* Gov't App. B at 4.[4]

On February 15, 2000, the Estate accepted an offer to sell the New York Condominium and executed a contract. *See* Gov't App. B at 15. On February 19, 2000, the Estate entered into a contract to sell the Condominium for $180,000. *See* PX B. The closing was to occur on or about August 1, 2000, however, Aquebog Abstract Corp. (the purchaser's "Title Insurance Company"), raised an exception to coverage, because there was no proof of payment of federal and state estate taxes. *See* PX C.

On April 10, 2000, an agreement was reached, whereby the Title Insurance Company would withdraw the exception, on the condition that the Estate deposit into an escrow account the proceeds from the sale of the Condominium or, if less, sufficient funds to cover the Estate's estate tax liabilities, based on a "worst case scenario." *See* PX D ("Escrow Agreement").[5]

---

[3] Pursuant to the laws of the State of New York, "A mortgage of real property does not imply a covenant for the payment of the sum intended to be secured; and where such covenant is not expressed in the mortgage, or a bond or other separate instrument to secure such payment has not been given, the remedies of the mortgagee are confined to the property mentioned in the mortgage." N.Y. REAL PROPERTY LAW § 249 (2006).

[4] Because the Estate did not file a tax return until November 12, 2004, over five years after it was due, the Estate could have incurred penalties and interest if any tax liability was later assessed. *See* PX M.

[5] The Escrow Agreement provided, in relevant part, that:

> Escrowee may, at any time and from time to time, apply all or part of the Escrow to the payment of the federal estate tax and/or penalties and interest thereon . . . and/or New York State estate tax and/or penalties and interest thereon . . . This includes payment of any amount that may ultimately be determined to have been an overpayment.

Gov't App. B at 36, ¶ 6.

The Escrow Agreement also provided that the escrowee could release the remainder of the escrow to the Estate only upon the occurrence of both of the following: (a) "a discharge of the [p]roperty from the lien of the [Federal Estate] Tax or a closing letter issued by the IRS . . . [,] or other proof of full payment of the Federal Estate Tax, reasonably satisfactory to [the Title Insurance Company][;]" and (b) similar proof that the New York Estate Tax had been paid. Gov't App. B at

Pursuant to the Escrow Agreement, a real estate broker issued an opinion stating that the value of the Mortgage on April 10, 2000 was $580,000. *See* PX H. Based on this value, the Estate's tax counsel estimated that, under a "worst case scenario," the amount of federal estate tax liability would be $245,791 and the New York estate tax liability would be $13,716, plus interest. *See* Hamburgh Aff. ¶ 14. These estimates, however, did not take into account the pending claim asserted by Decedent's brother or any deductions to which the Estate may have been entitled. *Id.*

On April 10, 2000, an affidavit was executed by the Estate's tax counsel for the Title Insurance Company, representing that:

> 3. The above figures are estimates submitted solely for the purpose of this Affidavit. The exact estate tax valuations of the various assets are subject to various factors. The Affidavit is made without prejudice to any position the Estate ultimately takes on or in connection with any federal, New York and/or Florida estate tax and/or estate tax return.
>
> 4. Based upon the foregoing estimates, I estimate that the gross estate for federal estate tax purposes is $1,194,000. I calculate the federal estate tax on an estate of $194,000 to be $178,474. [footnote omitted] Were this the tax on the Estate, there would be a late filing penalty of $44,619. [footnote omitted]. There would also be a late payment penalty of 5% of $8,924. Thus, on an estate of $1,194,000 I calculate the amount due as of today to be $232,017 plus interest.
>
> 5. Based upon the foregoing estimates, I calculate the New York State estate tax on the Estate to be $10,550. Were this the tax on the Estate, there would be a total late filing penalty of 25%, equal to $2,638. There would also be a late payment penalty of .5% per month that the payment is overdue, which at this point in time is 10 months, for a total penalty of 5%, or $528. Thus, I calculate the amount due as of today to be $13,716 plus interest.

Gov't App. B at 26-28.[6]

Subsequently, the Estate's tax counsel made handwritten computations estimating that: 1) if the gross value of the Estate was $1,074,000, the total federal estate tax liability would be

---

36-37, ¶ 7. The Escrow Agreement further provided that: "until the occurrence of both (a) and (b) Escrowee shall not release any part of the Escrow to the Estate or for any other purpose to the benefit of the Estate." *Id.*

[6] Footnote number 2 to the Affidavit stated that: "The actual tax is calculated on the taxable estate, which is the gross estate minus allowable deductions, such as for funeral and administration expenses and debts of the decedent. I have calculated the tax as if the gross estate were the taxable estate; i.e., I have disregarded all deductions." Gov't App. B at 27 (emphasis in original).

$184,905 and the New York estate tax liability would be $12,698; and 2) if the gross value of the Estate was $1,000,000, the total federal estate tax liability would be $145,374. *See* Gov't App. B at 31-33.

Subsequently, the Title Insurance Company agreed to withdraw the exception for unpaid estate taxes "provided that $165,000 of the sales proceeds were deposited into the escrow and the beneficiaries executed undertakings to personally pay any additional estate taxes that may be due." Hamburgh Aff. ¶ 15. The Title Insurance Company also agreed that any proceeds in excess of $165,000 would be used to reimburse the Estate's personal representative for expenses advanced on behalf of the Estate. *See* Hamburgh Aff. ¶ 15; *see also* Pl. PF Reply Ex. A.

On April 11, 2000, the personal representative of the Estate executed an affidavit "to induce [the Title Insurance Company] to insure title to the [property] in the purchasers against the lien of the . . . estate taxes." Gov't App. B at 42-43. The affidavit "acknowledge[d] that the [E]state is obligated to pay federal and New York estate taxes as a result of the death of Philip Goldstein, and that the net proceeds of sale of said real estate may be insufficient to pay the total amount of such taxes that are due and payable." *Id.* If the proceeds of the sale were insufficient to pay the taxes, the Estate's personal representative pledged to pay any deficiency, either from the Trust or from her personal funds. *Id.*

On April 17, 2000, the sale of the New York Condominium closed and the Estate received net proceeds between $167,054.19 and $168,480.00. *Compare* Hamburgh Aff. ¶ 15 (stating net proceeds were $168,480); *with* PX I (letter from the personal representative to Estate's tax counsel stating: "I am aware that you are presently holding approximately $167,000.00 as proceeds of sale from the closing [.]"); *see also* Gov't App. B at 55 (letter from Estate's tax counsel to personal representative representing that $2,054.19 remained of the original balance, after remitting $165,000 to the IRS).

On May 5, 2000, the personal representative instructed the Estate's tax counsel that the escrowed funds should be remitted to the IRS to stop the accrual of penalties and interest:

> [Y]ou are presently holding approximately $167,000.00 as proceeds of sale from the closing of the estate's real property in Westhampton Beach, New York. The sum of $165,000.00 should be applied to pay Federal Estate Taxes and/or New York Estate Taxes as soon as possible.

PX I.

On May 5, 2000, the Estate's tax counsel also hand-delivered a check to the IRS, with the notation "Estate Tax/Philip Goldstein" and the Estate's identification number. The accompanying cover letter stated:

> In accordance with our telephone conversation on April 13, 2000, I attach my Attorney IOLA Account check no. 1229, payable to the United States Treasury, in

> the amount of $165,000. This payment is to be applied to the estate tax on the above-named decedent [Philip Goldstein]. The Form 706 has as yet not been filed.

PX J.

The IRS posted the May 5, 2000 remittance as a "subsequent payment," under the transactional code ("code") 670. *See* Ex. G (Transcript of Account). The offsetting debit zeroed out the Estate's account and was coded "820-credit transferred," although the IRS had not assessed or proposed any federal estate tax liability. *Id.*

On May 9, 2000, the Estate's tax counsel sent a letter advising Plaintiff that: "I have paid $165,000 out of the escrow to the United States Treasury as a deposit against the federal estate tax." PX K.

On June 30, 2000, Plaintiff executed another affidavit "for the purposes of inducing . . . [the] purchase of the [Florida property]." Gov't App. B at 45-46. That affidavit represented that there were no "federal, state or county tax deficiencies, which could result in a lien or judgment affecting the title to the real or personal property hereinbefore described." *Id.* On the same day, the Estate executed a quit-claim deed conveying the Florida property. *Id.* at 47-48.

On December 19, 2000, the litigation with Decedent's brother was resolved by a Joint Stipulation that Decedent's brother possessed a 50% beneficial interest in the Mortgage. *See* PX G. (Stipulation Order). On February 7, 2002, the foreclosure litigation was settled between the Estate and Defendants, Soledad Place Corp., Bertram Goldstein, et al., awarding the Estate and Bertram Goldstein each 50% of the $340,144 Mortgage. *See* Hamburgh Aff. ¶ 18. On March 5, 2002, the Supreme Court of the State of New York entered an Order approving the settlement. *See* PX L (March 5, 2002 Stipulation and Consent Order Discontinuing Action, Cancelling Notice of Pendency, and Vacating Receivership Order). This allowed the Estate's tax counsel to assign $170,072 to the Mortgage value (instead of the $580,000 value used in computing the estate tax liability under the "worst case scenario"). *See* Hamburgh Aff. ¶18.

On November 12, 2004, the Estate filed a late federal tax return. *See* PX M (Form 706); *see also* Gov't App. B at 3-9. After deductions, the taxable estate was $636,126. *See* PX M. The federal tax due was $206,167. *Id.* After the unified credit[7] of $202,050 and a state estate tax credit of $4,117 were deducted, however, the Estate had no federal estate tax liability. *Id.* Accordingly, on April 29, 2005, the IRS issued an Estate Tax Closing Document, confirming that no federal estate tax liability was owed. *See* PX N.

On August 16, 2005, the Estate's tax counsel sent a facsimile to the IRS stating: "The estate received a closing letter, determining the tax to be $0, as set forth on the return. Upon inquiring by telephone today as to the status of the refund of the overpayment shown on the return, I was

[7] The IRC provides that a unified tax credit reduces federal estate tax liability due on a post-mortem transfer. *See* 26 U.S.C. § 2101.

informed that it had been disallowed. . . . I would appreciate receiving a written notice to said effect and a specific explanation of the reason(s) therefor." PX O. On August 29, 2005, the IRS replied: "This letter is your notice that we've disallowed you your claim for credit for the period shown above. . . .Your return was postmarked more than three years after the return due date plus any extensions." PX P.

## II. PROCEDURAL HISTORY.

On December 9, 2005, the Estate filed a Complaint in the United States Court of Federal Claims alleging that the May 5, 2000 remittance of $165,000 to the IRS was "a deposit in the nature of a cash bond that must be returned to the taxpayer upon demand therefor," pursuant to Rev. Proc. 84-58, 1984-2 C.B. 501. *See* Compl. ¶ 9. In addition, the Complaint alleges that 26 U.S.C. § 6511, *i.e.*, the statute of limitations, is not applicable to the May 5, 2000 remittance and therefore, the Estate is entitled to the refund of $165,000, with interest. *Id.* at ¶¶ 11-12.

On April 10, 2006, the Government filed an Answer. On May 30, 2006, the parties filed a Joint Preliminary Status Report. The court convened telephone status conferences on June 6, 2006 and June 21, 2006.

On October 16, 2006, the Government filed a Motion for Summary Judgment and Proposed Findings. On October 19, 2006, the Estate filed a Cross-Motion for Summary Judgment and Proposed Findings. On November 16, 2006, the Estate filed a Response to the Government's Motion for Summary Judgment and Proposed Findings. On the same date, the Government filed: a Response to the Estate's Motion for Summary Judgment; a Response to the Estate's Proposed Findings; and Proposed Additional Findings. On November 30, 2006, the Estate filed: a Reply to the Government's Response to the Estate's Motion for Summary Judgment; a Reply to the Government's Response to the Estate's Proposed Findings; and a Response to the Government's Proposed Additional Findings. On December 4, 2006, the Government filed a Reply. On February 12, 2007, the court held an oral argument on the Cross-Motions for Summary Judgment.

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Appeals for the Federal Circuit has held that, under the Tucker Act (28 U.S.C. § 1491), the United States Court of Federal Claims has "jurisdiction over suits seeking the return of money improperly paid to, exacted or retained by the government." *See New York Life Ins. Co.* v. *United States*, 118 F.3d 1553, 1556 (Fed. Cir. 1997); *see also Eastport S.S. Corp.* v. *United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) ("[T]he non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes – those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum[.] In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation); *United States* v. *Testan*, 424 U.S. 392,

400-02 (1976) ("[The Court of Claims did not have jurisdiction because plaintiffs did not] "rest their claims upon a contract [or] seek the return of money paid by them to the Government[.] Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis for the federal claim . . . does not create a cause of action for money damages [unless that basis can fairly be interpreted as mandating compensation]"); 28 U.S.C. § 1491 (authorizing the United States Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.")

Accordingly, the court has determined that it has jurisdiction to adjudicate the Estate's claim that the Government improperly retained the $165,000 remittance without legal authority, because the return of a tax "deposit" is a money-mandating remedy. *See* Rev. Proc. 84-58 § 4.04, 1984-2 C.B. 501 ("The taxpayer will be notified concerning the status of the remittance, and may elect to have the deposit returned, without interest, at any time before the issuance of a revenue agent's or examine's report[.]"); *see also Khan* v. *United States,* 201 F.3d 1375, 1378 (Fed. Cir. 2000) ("[T]he plaintiff 'must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.'" (internal citations omitted)); *Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]").

### B. Standard For Summary Judgment – RCFC 56(c).

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, to avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable factfinder to return a verdict for that party. *Id.* at 248-50 (citations omitted).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party

must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve all doubt over factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment").

The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks U.S.A., L.L.C.* v. *United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) ("[The court] determines for itself whether the standards for summary judgment have been met." (internal citations omitted)). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California* v. *United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

### C. Resolution Of The Parties' Cross-Motions For Summary Judgment.

The Internal Revenue Code ("IRC") requires that an estate file a tax return and pay any taxes due within nine months of a decedent's death. *See* 26 U.S.C. §§ 6075, 6151(a). In this case, the Estate made a remittance of $165,000 to the IRS on May 5, 2000, nearly a year after any tax payment would have been due. *See* PX J. A tax return was not filed until November 12, 2004, over five years after it was due. *See* PX M. Therefore, if the Estate owed taxes, it also would have incurred penalties and interest on any tax liability assessed thereafter. *See* 26 U.S.C. § 6601(a) ("If any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment, interest on such amount . . . shall be paid[.]"); 26 U.S.C. § 6651 (authorizing penalties for failure to file a tax return or to pay tax).

Section 6511 of the IRC requires that an estate claim overpayments within three years of the filing of an estate tax return or within two years of the date of payment, whichever expires later. *See* 26 U.S.C. § 6511(a). In this case, the return, *i.e.*, the claim, was filed on a timely basis. According to the same provision, however, an estate can only recover for overpayments made three years prior to the filing of the claim. *See* 26 U.S.C. § 6511(b)(2)(A). Since the Estate made the remittance on May 5, 2000, the latest possible date the Estate could have filed a claim and received a refund for

overpayment was May 5, 2003. Therefore, in this case, the tax return/claim was filed a year and half too late to receive a refund for overpayment.

Therefore, although the Estate ultimately had no tax liability, if the May 5, 2000 remittance was a "payment" of tax, the statute of limitations has run, and the Estate cannot recover the remittance as an "overpayment." On the other hand, if the May 5, 2000 remittance was a tax "deposit," the Estate may recover any funds remitted to the IRS. *See Rosenman* v. *United States*, 323 U.S. 658 (1945) (taxpayer was entitled to return of deposit paid more than three years after the filing of the claim); *see also* Rev. Proc. 84-58, 1984-2 C.B. 501.

**1. Since The Remittance At Issue Was Undesignated, Rev. Proc. 84-58 Requires That It Be Treated as a Tax Deposit.**

The Government contends that the remittance is a tax payment, because the Estate's tax counsel referred to it as a "payment" in the cover letter accompanying the $165,000 check. *See* Gov't Resp. at 4; *see also* PX J. The Government further argues that for the IRS to treat a remittance as a tax deposit, the remittance must be "designated by the taxpayer in writing as a deposit in the nature of a tax bond." *See* Gov't Resp. at 7-8 (citing *VanCanagan* v. *United States*, 231 F.3d 1349, 1353 (Fed. Cir. 2000) ("[T]he IRS itself has provided procedures and requirements for taxpayers wishing to make such deposits. The IRS merely requires that the taxpayer designate the remittance "in writing as a deposit in the nature of a cash bond." (quoting Rev. Proc. 84-58 § 4.02, 1984-2 C.B. 501[8])); *see also* TR 30-32, 39-41, 64.

The Estate contends that Rev. Proc. 84-58, 1984-2 CB 501 ("Rev. Proc. 84-58") requires that: "every remittance is either 'designated' or 'undesignated.' A 'designated' remittance is one that is specifically designated as a deposit. Every other remittance, including one that is specifically designated as a payment, constitutes an 'undesignated' remittance." Pl. Mot. at 3 (citing Rev. Proc. 84-58). The Estate insists that the May 5, 2000 remittance was a deposit, because:

---

[8] Rev. Proc. 84-58, section 4.02 on "deposits in the nature of a cash bond," provides as follows:

> *A remittance made before the mailing of a notice of deficiency that is designated by the taxpayer in writing as a deposit in the nature of a cash bond will be treated as such by the Service*. Such a deposit is not subject to a claim for credit or refund as an overpayment. The taxpayer may request the return of all or part of the deposit at any time before the Service is entitled to assess the tax. That amount will be returned to the taxpayer, without interest, unless the Service determines that assessment or collection of the tax determined to be due would be in jeopardy, or that the amount should be applied against any other liability. In such a case, the deposit will not be returned, but will be applied against a jeopardy or termination assessment or against the other liability.

Rev. Proc. 84-58 § 4.02 (emphasis added).

> *Any undesignated remittance not described in section 4.03*[9] *made before the liability is proposed to the taxpayer in writing (e.g., before the issuance of a revenue agent's or examiner's report), will be treated by the Service as a deposit in the nature of a cash bond.* Such a deposit is not subject to a claim for credit or refund and the excess of the deposit over the liability ultimately determined to be due will not bear interest under section 6611 of the Code. The taxpayer will be notified concerning the status of the remittance, and may elect to have the deposit returned, without interest, at any time before the issuance of a revenue agent's or examiner's report, subject to the provisions of subparagraph 1 of section 4.02.
>
> If the taxpayer leaves an undesignated remittance on deposit until completion of the examination, the Service will follow the procedure described in section 4.02.

Rev. Proc. 84-58 § 4.04 (emphasis added).

The Government replies that section 4.04 of Rev. Proc. 84-58, governing "undesignated remittances," applies only to remittances made during or after examinations, because of the parenthetical reference to the "examiner's report" and the "conclusion of the examination." Gov't Resp. at 6-7; *see also* TR 31-32, 38. In this case, however, the IRS did not examine the Estate's return when the remittance was made. Therefore, the Government argues that Rev. Proc. 84-58 is simply not relevant. The Government emphasized this point during the oral argument:

> GOVERNMENT COUNSEL: Section 4.04, the title of which is "Undesignated Remittances." Now, applying the usual canons of statutory construction, we ask ourselves what is this section talking

[9] Rev. Proc. 84-58, section 4.03 on "payments of tax" provides as follows:

> *A remittance not specifically designated as a deposit in the nature of a cash bond will be treated as a payment of tax if it is made in response to a proposed liability, for example, as proposed in a revenue agent's or examiner's report, and remittance in full of the proposed liability is made.* A partial remittance will not be treated as a partial payment of tax unless the taxpayer specifically designates what portion of the proposed liability the taxpayer intends to satisfy. If the remittance is treated as a partial payment of tax, it will be posted to the taxpayer's account as a payment as of the date it is received. That amount may be taken into account by the Service in determining the amount for which a notice of deficiency must be mailed. If the Service is unable to determine whether a partial remittance is intended to be a payment of tax or a deposit in the nature of a cash bond, the Service will treat the remittance as a deposit in the nature of a cash bond and will follow the procedures described in section 4.04 .

Rev. Proc. 84-58 § 4.03 (emphasis added).

about? There are two paragraphs in this section, one and two. Let's look first at two.

"If the taxpayer leaves an undesignated remittance on deposit until completion of the examination," until completion of the examination, "the Service will follow the procedure described in section 4.02."

Now, we're talking about the examination, not an examination. And we're talking about an undesignated remittance, not a remittance designated as a deposit. Now, an undesignated remittance not described in 4.03 made before the liability is proposed to the taxpayer in writing -- and I don't mean a liability, I mean the liability -- it will be treated as a deposit.

THE COURT: But doesn't that presume that there has been, in effect, a valuation or assessment of the liability, which was not the case here?

GOVERNMENT COUNSEL: Well, it wouldn't be an assessment, because --

THE COURT: Maybe I'm using the wording inappropriately.

* * *

THE COURT: But there was no liability, the IRS never said you owe us X.

GOVERNMENT COUNSEL: Right, this was before any liability is proposed. During the examination, this is treated as a deposit in the nature of a cash bond.

THE COURT: There was no examination, per se, was there?

GOVERNMENT COUNSEL: In this case, there wasn't, no. That's why this doesn't apply to this case.

THE COURT: So your argument is that this provision applies only when there is a formal examination.

GOVERNMENT COUNSEL: Before -- yes. It talks about the examination and the liability.

THE COURT: And so the government's argument is the regulation is irrelevant.

GOVERNMENT COUNSEL: Well, I wouldn't say it's irrelevant. I wish I could. But the way the Federal Circuit has read this is that it governs all -- that is, not the section, but the revenue procedure -- governs all remittances. And as they say in *Van Canagan*, whether they understand it rightly or not, I don't know, but they are binding, they say that it's easy to have your remittance treated as a deposit. All Rev Proc 84-58 requires you to do is tell the IRS this in writing.

TR 30-32.

The Estate counters that Rev. Proc. 84-58, section 4.04 "applies to all remittances other than those which discharge a liability shown to be due on a return" and the reference to the "examiner's report is merely an example of a writing in which the IRS proposes a deficiency." Pl. Reply at 3; *see also* TR 51-54. During the oral argument, the Estate further explained:

ESTATE'S COUNSEL: Now, I'd also like to address this notion that 84-58 doesn't apply before an examination begins. You know, it is true probably that 99.9 percent of the time, that this becomes an issue is when there has been an examination. Because when a taxpayer has already paid the tax liability reported on his return, he doesn't come forth and pay more until the IRS rears its head.

When it comes in, then we have an examination. And that is undoubtedly when this becomes an issue.

*But to say that it only applies when there is an examination is really illogical. What they're saying is that there are no rules in that*

*situation; the taxpayer has no guidance. And that means we can do whatever we want.*

*The reality is that the rule should be applied exactly the same way before an examination as during an examination.* There are special rules that apply once a notice of deficiency is issued because of the Tax Court jurisdiction, and so on. But only in that situation does a taxpayer have to designate a remittance as a deposit in order for it to be regarded as such. In every other case it's automatic.

So they have to argue that 84-58 doesn't apply. And I'm not sure where that just ended up from this discussion, whether they think it does or they think it doesn't. I think they believe that it doesn't, but it clearly does, or you don't have a rule at all.

THE COURT: It seems to me that their argument is that it doesn't, but the Federal Circuit says that it does.

ESTATE'S COUNSEL: Well, the Federal Circuit says that it did in *Van Canagan*, because it's saying look, you guys paid your liability that you disclosed on this form where you've admitted it. If you want out of that problem you just created for yourself, you'd better have designated this as a deposit.

TR 50-52 (emphasis added).

The court has determined that the May 5, 2000 remittance was a deposit. First, Rev. Proc. 84-58 uses the terms "designated" and "undesignated" to modify deposits, not payments. *See* Rev. Proc. 84-58. Indeed, under Rev. Proc. 84-58, a taxpayer either may "designate" remittances as deposits or leave them "undesignated." *Id.* Therefore, under Rev. Proc. 84-58, it would be impossible for the Estate to "designate" the remittance as a payment. Accordingly, the cover letter referring to the May 5, 2000 remittance as a "payment" is not determinative. Second, section 4.03 provides that "[a] remittance not specifically designated as a deposit in the nature of a cash bond will be treated as a payment of tax if it is made in response to a proposed liability." Rev. Proc. 84-58 § 4.03. In this case, however, the Estate did not make the remittance in response to a proposed

liability. Alternatively, section 4.04 provides that "any undesignated remittance not described in section 4.03 made before the liability is proposed to the taxpayer in writing (*e.g.*, before the issuance of a revenue agent's or examiner's report), will be treated by the Service as a deposit in the nature of a cash bond." Rev. Proc. 84-58 § 4.04. Because these sections refer to one another, they were meant to be interpreted in combination. *See* 1A SUTHERLAND STATUTORY CONSTRUCTION § 32A:15 (6th ed.) ("The courts are unanimous concerning the primary legal effect of a statutory reference. Whenever an act of the legislature brings into itself by reference pre-existing common law precepts or the terms of another act, the precepts and terms to which reference is made are to be considered and treated as if they were incorporated into and made a part of the referring act just as completely as though they had been explicitly written therein."); *see also* 2A SUTHERLAND STATUTORY CONSTRUCTION § 46:5 (6th ed.) ("A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus, it is not proper to confine interpretation to the one section to be construed.). Therefore, the court has determined that the term "any undesignated remittance" (Rev. Proc. 84-58 § 4.04) refers to "[a] remittance not specifically designated as a deposit in the nature of a cash bond" (Rev. Proc. 84-58 § 4.03). The court discerns no language in section 4.04 that limits its application to examinations *only*. Accordingly, the remittance at issue in this case was "undesignated" and Rev. Proc. 84-58, section 4.04 requires that it be treated as a tax deposit.

**2. Governing Precedent Also Requires The Court To Conclude That The Remittance At Issue Was A Tax Deposit.**

In the alternative, the Government argues that to the extent Rev. Proc. 84-58 is ambiguous[10] or inapplicable to this case, the court must rely on case law to determine the character of the remittance. *See* TR 22-23,32, 36-38, 46.

A tax "deposit" is a judicially created concept first recognized in *Rosenman* v. *United States,* 323 U.S. 658 (1945). *See VanCanagan*, 231 F.3d at 1352. In *Rosenman*, the taxpayers received an extension of time for filing an estate tax return, but did not receive an extension for making a payment. *See Rosenman* 323 U.S. at 659-60. Thereafter, the taxpayers delivered a check to the IRS for $120,000 with a letter stating: "We are delivering to you herewith, by messenger, an Estate check payable to your order, for $120,000, as a payment on account of the Federal Estate tax. This payment is made under protest and duress, and solely for the purpose of avoiding penalties and

---

[10] During oral argument both parties observed that Rev. Proc. 84-58 "is not a model of clarity" (TR 39) and suffers from "sloppy draftmanship" (TR 49). Arguably, for that reason, Rev. Proc. 84-58 was revised in 2005. The court has observed that the version of the regulation now in effect is more clear. *See* Rev. Proc. 2005-16, 2005-10 I.R.B. 674 ("Except as provided in sections 4.04(1) and 4.05(3), *a remittance that is not designated as a deposit (an "undesignated remittance") will be treated as a payment* and applied by the Service against any outstanding liability for taxes, penalties or interest.") (emphasis added)). Rev. Proc. 2005-16, however, was not effective until five years after the remittance was made. *Id.*

interest, since it is contended by the executors that not all of this sum is legally or lawfully due." *Id.* at 660. The IRS placed the remittance in a suspense account to the credit of the estate. *Id.*

Under these circumstances, the United States Supreme Court required that the remittance be treated as a deposit, because it "did not discharge what [the taxpayers] deemed a liability nor pay one asserted [by the IRS]," but was "merely an interim arrangement to cover whatever contingencies the future might define." *Id.* at 662. The Court warned that: "It will not do to treat the same transaction as payment and not as payment, whichever favors the Government. . . . If it is not payment in order to relieve the Government from paying interest on a subsequently determined excess, it cannot be payment to bar suit by the taxpayer for its illegal retention." *Id.* at 663; *see also Baral* v. *United States*, 528 U.S. 431, 438 n.1 (2000).[11] In that regard, the Court also noted that the Current Tax Payment Act of 1943, Ch. 120, 57 Stat. 126 (presently codified at 26 U.S.C. § 6401(c)), which was not effective until after the Rosenman's cause of action accrued, was enacted to remedy this asymmetry. *See Rosenman,* 323 U.S. at 663. Indeed, recognizing that if remittances are not tax payments until the IRS assesses an amount due, taxpayers cannot collect interest on excess withholdings, section 6401(c) provides: "An amount paid as tax shall not be considered not to constitute an overpayment *solely by reason of the fact that there was no tax liability* in respect of which such amount was paid." 26 U.S.C. § 6401(c) (emphasis added).

Following *Rosenman*, the predecessor to the United States Court of Appeals for the Federal Circuit in *Natural Gas Co.* v. *United States*, 354 F.2d 310 (Ct. Cl. 1965), set forth an analytical framework for determining whether an IRS remittance should be treated as a tax payment or tax deposit in light of 26 U.S.C. § 6401(c):

> [T]he fact that there has been no assessment or tax return which sets forth the tax liability should not of itself negate 'payment.' *There must be other factors present* which, taken in conjunction with the facts of no tax liability have the effect of negating 'payment.' . . . *The 'other factors' we look for are whether the remittances are disorderly, or whether the remittance is followed by a contest*. Where a taxpayer admits that it has some liability, but simply dumps funds on the government in

---

[11] The United States Supreme Court has observed that:

> Central to our analysis . . . [in *Rosenman*] was a concern that the [IRS] should not be able to treat the same remittance as a payment for statute of limitations purposes – disadvantaging the taxpayer by decreasing the time in which a refund claim could be filed – and as a deposit for purposes of accrual of interest on overpayments – disadvantaging the taxpayer by starting the accrual of interest only at assessment. . . . Indeed, we suggested that an amendment to the Code disapproving of the Service's treatment of remittances as deposits for interest purposes might change the analysis.

*Baral*, 528 U.S. at 438 n.1 (citations omitted).

> amounts which have no conceivable relationship to the temporarily undetermined liability, we have no trouble holding that the remittance is not a bona fide payment and should not earn interest. Similarly, where a taxpayer remits funds and then contests the liability, we have felt that the *Rosenman* principle should apply.

*N. Natural Gas Co.*, 354 F.2d. at 315 (emphasis added).

The *N. Natural Gas* court reasoned that the remittance at issue in that case was a tax "payment," because plaintiff "did not simply dump funds on the Commissioner . . . but replied to a deficiency notice[.]" *Id.* at 316; *see also Reading Co.* v. *United States*, 98 F.Supp. 598, 599 (Ct. Cl. 1951) (holding that plaintiff made a tax "payment" where a remittance was: 1) not disorderly, but was instead based on plaintiff's good faith estimate of tax liability; and 2) not contested); *Charles Leich and Co.* v. *United States*, 329 F.2d 649, 653 (Ct. Cl. 1964) (holding that "the factors of 'contest,' coupled with the fact of no assessment, are sufficient to negate 'payment.'"); *Cohen* v. *United States,* 995 F.2d 205, 209 (Fed. Cir. 1993), *aff'g* 23 Cl. Ct. 717 (1991) (the United States Court of Appeals for the Federal Circuit extended the principle in *Leich* that a remittance should be treated as a tax "deposit," despite the fact that it was submitted in reply to a deficiency notice, because taxpayers made clear at every stage that they contested the assessment); *New York Life Ins. Co.*, 118 F.3d at 1559 (concurring with *Cohen* that a "taxpayer's remittance, made under protest following a notice of deficiency and that reserved the right to seek return of the money . . . made the remittance a deposit as a matter of law." (internal quotations omitted)).

Accordingly, the United States Court of Appeals for the Federal Circuit has instructed trial courts that:

> The question whether the remittance is a payment of tax or a mere deposit to stop the running of interest is complicated by the widely differing circumstances which prompt taxpayers to take such action. These surrounding factors are usually determinative of the question whether the remittance is a payment or a deposit.

*Cohen* 995 F.2d at 208; *see also Baral,* 528 U.S. at 438 (determining whether a remittance is a payment or a deposit depends on the "tenor of the business transaction" (internal quotations and citations omitted))*; VanCanagan*,[12] 231 F.3d at 1353 (the determination whether "a remittal of

---

[12] Form 4868 requires that a taxpayer disclose an estimated tax liability for the prior year and deduct the portion of that tax liability that was previously paid. As a condition of the extension of time for filing the return, a taxpayer is required to pay the balance of that tax liability in full. Form 4868 specifically characterizes an accompanying remittance as a payment in full of a liability that a taxpayer estimates is due.

The United States Court of Appeals for the Federal Circuit held that the remittance at issue in *VanCanagan* accompanied by a Form 4868, was a tax "payment," under the principles of *Rosenman,* but declined to adopt a *per se* rule that all remittances accompanying a Form 4868 are

money against an assessed or likely tax liability . . . consitute[s] . . . a payment or deposit of taxes" depends upon the particular "circumstances" (quoting *New York Life Ins. Co.*, 118 F.3d at 1557)); *Fisher* v. *United States*, 28 Fed. Cl. 88, 91 (1993) ("the characterization of a remittance is based upon a facts and circumstances test")).

Therefore, governing precedent requires the court to ascertain whether the remittance at issue in this case was a tax "payment" or tax "deposit," based on "factors" that bear on the "tenor of the business transaction." *Cohen* 995 F.2d at 208; *see also Baral,* 528 U.S. at 438.[13] In addition to the definition of liability, existence of a disorderly remittance, and taxpayers contest of liability, the court may also consider "the taxpayer's intent in remitting the money, and how the IRS treats remittance upon receipt." *Fisher*, 28 Fed. Cl. at 92 (citation omitted); *see also Rosenman*, 323 U.S. at 662-63; *N. Natural Gas Co.*, 354 F.2d at 315.

**3. Analysis of "Factors" That Bear On The "Tenor Of The Business Transaction."**

**a. The Estate Had No Tax Liability At The Time The Remittance Was Made.**

In this case, all parties agree that the May 5, 2000 remittance was not made in response to an IRS assessment, proposed deficiency, or notice of deficiency, but instead was entirely voluntary. *See* PX G; *see also* Gov't PF Resp. ¶ 20; TR 8-10, 16. Accordingly, the absence of "an obligation imposed by law to pay any tax" weighs in favor of characterizing the remittance as a deposit, instead of a payment.[14] *See Leich*, 329 F.2d at 653 (holding that "the factor of no tax liability" coupled with

---

"payments," and therefore affording a taxpayer the opportunity to rebut the presumption that remittances accompanying a Form 4868 are payments by a *clear expression of intent* that the remittance be treated as a deposit. *VanCanagan*, 231 F.3d at 1354.

In this case, the presumption that a remittance is a tax "payment" does not arise, because the taxpayer sent the IRS the remittance without a Form 4868, admitting liability or characterizing the remittance as a tax "payment." In applying *VanCanagan* to this case, the issue is whether the Estate's letter, like a Form 4868, admitted liability and characterized the remittance as a payment of that liability under the *Rosenman* principle. *See* TR 25-25.

[13] The Estate argues that *New York Ins. Co.* and *Cohen* dictate that the remittance in this case was a deposit as a matter of law. *See* Pl. Reply at 17-21. The court disagrees. The holdings in *New York Ins. Co.* and *Cohen* that the remittances were deposits were based on facts not present in this case, *i.e.,* plaintiffs made the remittances in response to deficiency notices, but also contested them.

[14] The United States Supreme Court has rejected the *per se* rule previously adopted in *Thomas* v. *Mercantile Nat'l Bank at Dallas*, 204 F.2d 943 (5th Cir. 1953), that all remittances made prior to the actual assessment of a tax liability are deposits. *See Baral*, 528 U.S. at 437-39*; see also*

one other factor makes the remittance a deposit). Likewise, the fact that the Estate had not yet filed a tax return, weighs in favor of a finding that the remittance at issue in this case was a deposit. *See* PX M; *see also Rosenman*, 323 U.S. at 659-60 (remittance was held to be a deposit where IRS had not asserted liability by an assessment, proposed deficiency, or notice of deficiency and the Estate had not filed a tax return admitting any tax liability).

**b. The Remittance Was "Disorderly."**

The Estate argues that the May 5, 2000 remittance was disorderly, because it was merely "an interim arrangement to cover whatever contigencies the future might define." *See* Pl. Mot. at 6 (citing *Rosenman*, 323 U.S. at 662 (holding remittance was made to avoid penalties and interest on any estate tax liability that might be owed)). Among those contingencies, was the fact that the sale of the Condominium involved a title that was encumbered by a lien for any estate taxes that may become due. *See* Pl. Reply at 13; *see also* Pl. Resp. at 8. For this reason, the title insurance policy included an exception to coverage if any such lien would prevent the Estate from selling the property. *See* Pl. Reply at 13; *see also* Pl. Resp. at 8; PX C. As a result, the Estate entered into an agreement with the Title Insurance Company to omit the exception, if the Estate placed the proceeds from the sale in escrow to cover any tax liability that the Title Insurance Company may have incurred. *See* Pl. Reply at 13; *see also* Pl. Resp. at 8; PX D; TR 6. Specifically, the Escrow Agreement provided that if the Estate could show that potential liability for all federal and state estate taxes in a "worst case scenario" was less than the proceeds from the sale of the Condominium, the Title Insurance Company would agree that the lesser amount could be held in escrow. *Id.* The Estate's tax counsel's worst case estimate for federal estate tax liability was $245,791 and for New York estate tax liability was $13,716, plus interest. *See* Pl. Reply at 14; *see also* Pl. Resp. at 9. The Estate contends that these figures "bore no relationship to what [the Estate's counsel] believed to be the [E]state's federal and state estate tax liability and it bore no relationship to the $165,000 remittance." Pl. Reply at 14; *see also* TR 15. Instead, the Estate's tax counsel computed the "worst case scenario" based on the following assumptions: the Estate included the Decedent's brother's share of the mortgage; the value of the mortgage was the value of the mortgaged property; the mortgaged property was valued at $580,000; none of the expenses incurred by the Estate were deducted; and each issue involved in the ongoing litigation was resolved completely in favor of the Estate. *See* Pl. Reply at 14; *see also* Pl. Resp. at 9; PX E. *Id.* Accordingly, the Estate argues that the figures were not good faith estimates of the Estate's actual tax liability, because the Estate's tax counsel "knew that it was unlikely that each of those issues would be resolved 100% in favor of the [E]state . . . [and] knew that the [E]state was entitled to deductions which the computations did not take into account." *See* Pl. Resp. at 10; *see also* TR 15.

Instead, the Estate insists that the remittance represents the proceeds from the Condominium sale only. *See* Pl. Reply at 15. The Estate notes that since the Estate's tax counsel was unable to satisfy the Title Insurance Company that the potential tax liability would be less than the proceeds from the sale of the Condominium, the alternative was to place the *proceeds* in escrow and guarantee

---

TR 44.

payment for any shortfall. *Id.* at 14-15; *see also* Pl. Fact Reply Ex. A. Moreover, the Estate argues that "[w]hile [the Estate's tax counsel] had good reason to believe that no tax would be owed," a deposit with the IRS would stop the accrual of any potential interest and penalties on any tax liability that might be determined. *Id.* at 15; *see also* Pl. Resp. at 11; TR 9. Accordingly, "the [E]state had everything to gain and nothing to lose by remitting the sales proceeds as a deposit." Pl. Resp. at 11. As the Estate explained at the oral argument:

| | |
|---|---|
| THE COURT: | Okay. And so how did we come up with $165,000? |
| ESTATE'S COUNSEL: | Well, the title insurance company said -- the Plaintiff went to the title insurance company and said look, I've got to pay my lawyer. Will you be satisfied with 165 instead of 168? |
| THE COURT: | How do we know that in the record? |
| ESTATE'S COUNSEL: | It's in the record. It's in the affidavit. |
| THE COURT: | Okay. Whose affidavit is it in? |
| ESTATE'S COUNSEL: | This is the attorney whose fees were paid by that, and who negotiated the deal for the Plaintiff with the title insurance company. |
| THE COURT: | I'll go back and look at that. |
| ESTATE'S COUNSEL: | Okay. But basically, they said look, we'll be willing to accept 165 of 168 so you can pay your attorney, but in exchange we want you to sign what's called an undertaking, I guess, under New York law, that basically says that she will be personally liable for any shortfall resulting from them doing this.<br><br>And so she signed it. And it turns out that there was no shortfall[.] |

TR 20-21.

The Government counters that the Estate did not make a "disorderly remittance," because it "carefully estimated its tax liability" in "pursuance of the actual or reasonably apparent requirements

of the code." *See* Gov't Resp. at 12; *see also* Gov't Mot. at 19 (citing H.R. REP. NO. 78-510, at 48 (1943) (Conf. Rep.) (defining "disorderly remittance")).[15] In addition to the $245,791 estimate of federal estate tax liability, the Government notes that the Estate's tax counsel made two other calculations. *See* Gov't Mot. at 23; *see also* Gov't App. B at 31-33. In the second calculation, the Estate's tax counsel lowered the value of the Mortgage subject to litigation, to reduce the value of the gross estate to $1,074,000, for a total federal estate tax of $184,905. *Id.* In the third calculation, the Estate's tax counsel deducted $194,000 from the gross estate to reduce the value to $1,000,000, for a total federal estate tax of $145,374. *Id.* The average of the second two calculations rounded to the nearest thousand is $165,000 – an amount equal to the amount that the Estate remitted to the IRS. *See* Gov't Mot. at 23. Therefore, the Government insists that the $165,000 remittance was the average of those two calculations. Accordingly, because the remittance had a "conceivable relationship to the temporarily undetermined liability," the Government concluded that the May 5, 2000 remittance was "disorderly." *Id.* at 24 (quoting *N. Natural Gas Co.*, 354 F.2d at 315).

Based on all of these considerations, the court has determined that the $165,000 remittance was not based on a good faith estimate of any taxes due, but instead represented the value of the Condominium, minus expenses. *See N. Natural Gas Co.*, 354 F.2d at 315.(*i.e.*, the remittance "ha[d] no conceivable relationship to the temporarily undetermined liability.").[16] The Government's proposition that the remittance was based on the average of the Estate's tax counsel's second two handwritten calculations is not credible, because this information was never reported to the Title Insurance Company. Nevertheless, even if the remittance was based on the "worst case scenario" calculation made *for the purpose of carrying out the Escrow Agreement*, the calculation excluded estate tax deductions and values based on probable litigation outcomes, and therefore was not made in "pursuance of the actual or reasonably apparent requirements of the code." H.R. REP. NO. 78-510,

---

[15] The Government cites the following legislative history to U.S.C. [1939 Code]§ 3770(c) as the origin of the "disorderly remittance" test:

> It is thought that the code does not contemplate that liability for interest can be cast on the Government merely by dumping money as taxes on the collector, by disorderly remittances to him of amounts not computed in pursuance of the actual or reasonably apparent requirements of the code, or not transmitted in accordance with the procedures set up by the code, or by other abuses of tax administration.

H.R. REP. NO. 78-510, at 48 (1943) (Conf. Rep.).

[16] In allowing the Estate to use funds in escrow to pay expenses, the Government argues that the Title Insurance Company either waived its rights under the Escrow Agreement and accepted different terms or received reasonably satisfactory proof that the Estate had paid any tax liability due, *i.e.*, estate tax liability calculations, plus $165,000 remittance, and the guarantee of the Estate's personal representative. *See* Gov't PF Resp. ¶ 16. The Government suggests that this is a genuine issue of fact that cannot be resolved on summary judgment, but concedes that it is not material. *Id.*

at 48 (1943) (Conf. Rep.). Accordingly, the court has determined that the Estate's May 5, 2000 remittance was disorderly.

### c. The Fact That The Remittance Was Not Made Under Protest Is Not Determinative.

The Government also contends that the remittance was a payment, because the Estate did not notify the IRS that liability for the $165,000 was made under protest. *See* Gov't Mot. at 18. Therefore, the Government argues that this case is distinguishable from *Rosenman*, where the taxpayers sent the IRS a letter "contesting" liability, even though the IRS had not proposed a deficiency. *Id.* (quoting *Rosenman*, 323 U.S. at 660 ("This payment is made under protest and duress, and solely for the purpose of avoiding penalties and interest, since it is contended by the executors that not all of this sum is legally or lawfully due.")).

THE COURT: So if the Plaintiff in this case had written the words -- and in your interpretation they would have had to say here's my money, and I'm informing you that it is a tax deposit. They would have had to do that. Or say here's my money, and I don't think I owe anything, but if I do, I contest. Either one of those would have been satisfactory to the government.

GOVERNMENT COUNSEL: Or anything that would put the IRS on notice that they're not paying their tax here. In *Rosenman* one of the things they said was we're giving you this money only to avoid penalties and interest.

TR 41.

The Estate counters that "a taxpayer can not contest a liability that the IRS has not proposed." Pl. Resp. at 14. The Estate insists that a "contest" only operates to transform remittances that would otherwise constitute payments into deposits. *Id.* at 14 (citing *N. Natural Gas Co.,* 354 F.2d at 315 (holding that remittance was a payment, where taxpayer received IRS statutory notice of deficiency and paid the full amount of the proposed deficiency, without contest); *see also Leich,* 329 F.2d at 653 (holding that a remittance was a deposit where taxpayer received a letter from the IRS proposing tax deficiencies and paid the full amount proposed, but also protested liability); *Cohen,* 995 F.2d at 208-09 (holding that a remittance was a deposit where the taxpayer received statutory notice of deficiency and paid the full amount proposed, but attached a letter to the IRS contesting liability)); *see also* TR 12-13.

In this case, however, the IRS did not issue a proposal or notice of tax deficiency and the Estate's remittance was not a good faith estimate of its tax liability. Under these circumstances, the court has determined that the Estate had no duty to make the remittance under protest. Therefore, the fact that the remittance was not made under protest is not determinative.

**d. The Estate Intended The Remittance To Be A Tax Deposit.**

The Government argues that the Estate intended to make a payment. *See* Gov't Resp. at 12, 15. The Government relies on the fact that the Estate's tax counsel called the remittance a "payment" in the accompanying cover letter (PX J), had the amount listed as "prior payments" and "overpayments" on the estate tax return (PX M), and later asked the IRS about "the status of the refund of the overpayment shown on the return." (PX O). *Id.* at 12, 15 (citing *Zeir* v. *United States IRS*, 80 F.3d 1360, 1364 (9th Cir. 1996) (holding a remittance to be a payment based, in part, on the fact that letter stated the check was "payment of the estimated federal estate tax" and the Form 706 placed the remittance in the category of "prior payments")). The Government also argues that the Estate's tax counsel must have known that "'overpayment is a term of art,'" and that tax deposits are not payments. *See* Gov't Mot. at 24-25 (quoting *Sorenson* v. *Sec'y of Treasury*, 557 F.Supp. 729, 734 (W.D. Wash. 1982), *aff'd*, 752 F.2d 1433 (9th Cir. 1985), *aff'd*, 475 U.S. 851 (1986)).[17]

The Estate responds that the fact that four days after the date of the remittance, the Estate's tax counsel sent a letter to the Estate's personal representative referring to the remittance as "a deposit against federal estate tax" evidences the Estate's intent that the remittance was a deposit. *See* Pl. Mot. at 5; *see also* PX K.

THE COURT: So what do I do about the issue of the taxpayer's intent?

[17] The Estate concedes that the Estate's tax counsel was not "mindful of the highly technical distinction that Rev. Proc. 84-58 draws between deposits and payments." *Id.* at 5 (relying on *Rosenman,* 323 U.S. at 659-60 and *New York Life Ins. Co.*,118 F.3d at 1553, where the court held that a remittance constituted a deposit, despite the taxpayers referring to it as a payment several times). In this case, the Estate, however, relies on the fact that the IRS commonly refers to a remittance as a payment in agency guidance pronouncements whether or not it is a payment or deposit. *See* Pl. Mot. at 5 (citing Service Center Advice 1998-002 (in which the Government said that an advance payment may be a deposit or a payment of tax, depending on the circumstances); Internal Revenue Manual, section 8.1.1.3.1, (in which all remittances, including deposits, are referred to as advance payments); Internal Revenue Manual, section 3.17.63.19.11.1 (which provides for treatment of advance payments as cash bonds); Private Letter Ruling 8943003, July, 11, 1989 (in which the Government said it is necessary to determine whether an advance payment is a deposit or payment of tax); Field Service Advice 199930014 (in which advance payments were held to be deposits)).

ESTATE'S COUNSEL:

Well, we'll be glad to address taxpayer's intent. However, under Rev Proc 84-58, intent is a very, very limited aspect of this, because the rules are very mechanical. They only allow the taxpayer to influence the characterization in very narrow circumstances. And none of those circumstances exist here.

For example, if the IRS proposes a liability and the taxpayer pays less than the full amount, the taxpayer then, in that situation, has the ability to designate his remittance as payments, if he is very specific about what portion of the proposed liability his remittance is intended to pay.

If he doesn't make that, then it's automatically treated as a deposit. That's the only time he can influence a remittance as a payment.

The only other situation is where the taxpayer pays the entire amount determined by the IRS, whether that's in a 30-day letter or a revenue agent's report or a 90-day letter. Either way, the taxpayer has the ability to pay that, and to designate it as a deposit, in which case it must be treated as a deposit.

In every other case, the characterization is forced upon the taxpayer by 84-58. And the characterization forced on this taxpayer in this situation is a deposit.

*Now, having said that, we think that the facts in this case are perfectly clear that they really did intend this just to be a deposit, because they had no clue what amount of tax was owed. They didn't think any was owed, but who knew until the litigation was over. They certainly didn't think it was $165,000; there was no way to come to that number.*

> *In a letter from the attorney to the Plaintiff just four days after it was remitted, he referred to the remittance specifically as a deposit. There's no doubt that his intention was to make a deposit.*

TR 18-20 (emphasis added).

The Estate also explains that the Estate's tax counsel entered the amount of the remittance in the blanks on the federal tax return entitled "overpayments" and "prior payments," because the IRS does not provide a blank on the return for return of deposits. *See* Pl. Resp. at 18.[18] In addition, the Estate insists that "a generic reference to the remittance as a payment would not constitute a designation of the remittance as a payment," because "based on the ordinary and customary use of the terms, a remittance is a payment." Pl. Mot. at 4-5; *see also* Pl. Reply at 20.[19]

The Government counters that the Escrow Agreement permitted the Estate to make disbursements only for "payment" of taxes, including "payment of any amount that may ultimately be determined to have been an overpayment." Gov't Mot. at 24-25; *see also* PX D. Therefore, when the Estate's tax counsel forwarded the $165,000 remittance to the IRS, he "either believed in good faith that he had paid the estate tax, or he violated the [E]scrow [A]greement." Gov't Mot. at 25.[20] In addition, the Government suggests that the Estate's personal representative's statement that no "'federal, state or county tax deficiencies, which could result in a lien or judgment affecting the title to the real or personal property hereinbefore described,'" could not have been true, "if she believed that the [E]state had merely 'dumped' onto the IRS a sum that bore no relation to the likely tax liability." Gov't Mot. at 9 (citing Gov't App. B at 42-43). The Estate responds that for the personal representative's statement to be true, she only needed to believe that the amount of the deposit, together with what she was willing to pay personally, was sufficient to satisfy whatever tax liability may be owed. Pl Resp. at 19.

---

[18] The Estate argues the *Zeir* court's use of the term "payment" and "prior payment" was only "incidentally supportive of its conclusion," and the remittance was a payment primarily because the remittance paid the liability shown to be due on the tax return. *See* Pl. Reply at 20.

[19] The Estate further argues that: "Webster's Dictionary defines 'remittance' as 'a sum of money remitted' or 'a transmittal of money.' It defines 'remit' as 'to send money to a person or place especially in <u>payment</u> of a demand.' It defines 'payment' as 'something that is paid.' It defines 'paid' as the past tense of 'pay,' and it defines 'pay' as 'to give in return for goods or service' or 'to discharge indebtedness.' 'Remittance' and 'payment' are clearly synonymous." Pl. Mot. 4-5.

[20] Although making a "deposit" may have violated the technical language of the Escrow Agreement, that issue is not before the court.

Certainly, to avoid any ambiguity about the intent of the taxpayer, the Estate's tax counsel should have referred to the remittance as a deposit, rather than a payment, in the accompanying cover letter. Moreover, other subsequent references to the remittance as "prior payments" and "overpayments" raise an issue as to the Estate's actual intent. On the other hand, four days after the date of the remittance, the Estate's tax counsel sent a letter to the Estate's personal representative, stating that he "paid $165,000 out of the escrow to the United States Treasury as a deposit against the federal estate tax," in accordance with instructions. *See* PX K. Moreover, it is significant that the language of the Escrow Agreement did not *require* the Estate to make a "payment" of tax liability, but merely created a mechanism for the Title Insurance Company to omit the exception for estate taxes without the Estate having to pay them. Underlying this is the fact that the Estate voluntarily transferred funds to the IRS as an "interim arrangement to cover whatever contingencies the future might define." *Rosenmam,* 323 U.S. at 662. In addition, the court finds it relevant that estate tax returns do not provide a blank for the return of deposits. Since the IRS could easily remedy this situation, any confusion about the intent of a voluntary payment should be construed in the taxpayer's favor.

**e. The IRS Treated The Remittance As A "Subsequent Payment."**

Finally, the Government argues that IRS's characterization of the remittance as a "670-subsequent payment" and not a deposit weighs in favor of characterizing the remittance as a "payment." *See* Gov't Resp. at 17 (citing *Rosenman*, 323 U.S. at 662 (holding that a remittance was a deposit where IRS had kept the money in a suspense account as a deposit); *Blatt* v. *United States*, 34 F.3d 252, 254 (4th Cir. 1994) ("Largely because the IRS placed the money in a non-interest bearing 'suspense account' from which money was later drawn to pay tax obligations, the remittance was held [in *Rosenman*] to constitute a deposit and not a payment of taxes.")).

The Estate counters that "the manner in which the defendant codes remittances is arbitrary and irrelevant to the determination of whether a remittance is a deposit or a payment." Pl. Resp. at 22; *see also* TR 26. Moreover, the Estate argues that the IRS did not consider the remittance a payment, because the relevant regulations require that "estimated payments of estate tax remitted in 2000 be coded '660 – estimated tax payment.'" *See* Pl. Reply at 11 (citing Internal Revenue Manual, Section 5.1.2.1.4 (01-22-2001) (requiring code 660 be used for "ES payments on BMF and NMF modules for Estate Taxes (Form 706) and Gift Taxes (Form 709)")); *see also* TR 25-26. And, code 670 "is commonly used when the character of the remittance is unknown." Pl . Reply at 10 (citing Internal Revenue Manual, Section 5.1.2.1.4 (01-22-2001) (including as a code 670: all assessed amounts and accrued failure to pay penalty and interest; all federal tax deposits secured by an employee in an area office; all BMF estimated payments for the Form 1120 series of returns; payments of lien fees; and payments received resulting from service center actions)); *see also* TR 26. Finally, the Estate posits that, if the IRS believed the remittance was a payment it would have posted interest to the Estate's account. *See* Pl. Reply at 12. Accordingly, "[t]he absence of interest postings is compelling, perhaps conclusive, evidence that the IRS regarded the remittance as a deposit." *Id.*; *see also* TR 26.

The United States Court of Appeals for the Federal Circuit has held that the IRS's treatment of a remittance is one factor that the court may consider when characterizing a remittance, but it is not determinative. *See VanCanagan*, 231 F.3d at 1353. In *Rosenman*, the taxpayers' actions and intent persuaded the court that the remittance should be characterized as a deposit and the IRS's use of a suspense account made this determination more clear. *See Rosenman*, 323 U.S. at 662-63. In this case, however, the IRS's coding of the remittance as a "670 - subsequent payment" does not outweigh the other evidence indicating that it was a deposit.

**4. The Estate May Not Recover Interest On The Tax Deposit.**

During the February 12, 2007 oral argument, the Estate withdrew its claim for interest on the deposit.[21] *See* TR 18.

**IV. CONCLUSION.**

For the aforementioned reasons, the court has determined that the Estate's May 5, 2000 remittance was a deposit. The court hereby grants the Estate's October 19, 2006 Motion for Summary Judgment and denies the Government's October 16, 2006 Motion for Summary Judgment.

The Clerk of the United States Court of Federal Claims is directed to enter judgment in favor of the Estate in the sum of the $165,000.

**IT IS SO ORDERED.**

**s/Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**

---

[21] "Post-judgment interest on a claim against the United States is available only if, and to the extent that, there exists a provision in the substantive law granting interest with respect to the underlying claim." *Stanley* v. *United States*, 140 F.3d 1023, 1030 (Fed. Cir. 1998) (denying post-judgment interest on plaintiff's deposit); *see also Busser* v. *United States*, 130 F.2d 537, 538 (3d Cir. 1942) ("the sovereign is not liable for interest unless there is a statutory requirement or a contract to pay it" (citing *Tillson* v. *United States*, 100 U.S. 43 (1879)); 28 U.S.C. § 2516 (1994). In this case, there is no statute authorizing interest for the time during which the Government improperly retained the deposit.